STATE of Wisconsin, Plaintiff-Respondent,

v.

Diane McCROSSEN, Defendant-Appellant.

Supreme Court

*No. 85–0965–CR. Argued March 5, 1986.—Decided April 16, 1986.*

(Also reported in 385 N.W.2d 161.)

For the defendant-appellant there were briefs and oral argument by *Louis B. Butler, Jr.,* assistant state public defender.

For the plaintiff-respondent there was a brief by *Kirbie Knutson,* assistant attorney general, and *Bronson C. La Follette,* attorney general, and oral argument by *Daniel J. O'Brien,* assistant attorney general.

STEINMETZ, J.   There are two issues in this case:

(1)   Did the state's failure to provide the defend-- ant an alternative test for determining alcohol concentration while she was under arrest for operating an automobile while under the influence of intoxicants violate due process and thereby require dismissal of the charge against her?

(2) Did the trial court's refusal to allow the defendant to present evidence that she had requested an alternative test which was not provided, and that she was incorrectly told she would have to pay for an alternative test if given, and that she was held in custody longer than necessary, violate due process by depriving her of the right to present a defense?

We hold that the state's refusal to provide an alternative blood alcohol test did not violate due process, and therefore the trial court correctly refused to dismiss the charge against the defendant. We also hold that the trial court properly refused to permit the defendant to present evidence about the alternative test because the trial court suppressed the results of the first test.

Diane McCrossen, the defendant, is before the court on appeal from a judgment of conviction and sentence entered October 31, 1984, in the Milwaukee county circuit court, Honorable Arlene D. Connors. This is the defendant's second conviction for operating under the influence of an intoxicant contrary to secs. 346.63(1)(a) and 346.65(2), Stats., rendering this a criminal conviction.

Upon conviction, the defendant was sentenced to an indeterminate term of not more than five days in the house of corrections and fined $300 plus a 15 percent penalty assessment, a $150 driver improvement surcharge and court costs. Her license also was revoked for a period of nine months. The action was commenced July 11, 1983, by the filing of a criminal complaint. The jail sentence and fine have been stayed pending appeal.

Prior to trial, the defendant filed a motion to dismiss the charge and an alternative motion to suppress the breathalyzer test. She based her motions on the

state's failure to provide an alternative test as requested by the defendant. At the hearing on the motion, the defendant testified that she was arrested in the early morning hours of July 10, 1983, for operating a motor vehicle while under the influence of intoxicants. Following her arrest, she was taken to the police station and was given a breathalyzer test. The result of the test indicated that her alcohol concentration was .24 percent.

The defendant asked Police Officer Gonzales, the arresting officer, and Officer Pamela Puls, who administered the breathalyzer test, if she could have another test because she could not believe the results of the first test. She informed the officers that she wanted either a blood or urine test. The officers told her she would have to pay for such a test, to which the defendant agreed. The police, however, never administered the requested alternative test. The defendant also was never informed that there was an alternative test that the police department was prepared to administer at police expense.

The defendant also was not informed that she could be released in order to get an alternative test at her own expense. She was allowed to make a phone call. She called Sieggy Weiss, a friend, and asked him to post bail for her release. Weiss indicated that he would promptly post bail.

Weiss testified that he arrived at the police station at 6:00 a.m. on July 10, 1983. When he arrived a police officer would not let him into the building because the defendant's name was not on a list maintained by the officer. The officer then called upstairs to check on the defendant's status, and was told they did not have anyone with the defendant's name and so he again refused

to permit Weiss to enter. Weiss informed the officer that he was there to bail the defendant out of jail. He had $500 bail money with him.

After he was refused entry, Weiss went home and called the police station every hour requesting entry to bail the defendant out of jail. Each time he called, he was told that he should call back in an hour. Eventually, Weiss was told that he would be able to post bail for the defendant. He returned to the police station and posted her bail in the early afternoon.

The testimony of the arresting officer and the officer who administered the breathalyzer test differed from the defendant's rendition of the conversation in the testing room. For purposes of the issues in this case, we accept the defendant's version. However, the testing officer did testify that if an individual wanted to have an alternative test performed, it would not be done at the expense of the police department, but at the expense of the defendant. This was consistent with the defendant's recollection of that officer's statements. The state concedes that the officer was incorrect about who would have to pay for an alternative test.

The trial court ruled that the breathalyzer result should be suppressed because the defendant's statutory rights were violated. The court refused to dismiss the complaint, however, because the violation was of a statutory right rather than a constitutional right. No constitutional right was implicated because the trial court could not conclude that the results of an alternative test would have been exculpatory. The trial court concluded that there was a deliberate omission to allow the defendant to get either a blood or urine sample for alternative testing, as required by statute, and that

suppression of the first test result was an appropriate sanction.

During defense counsel's opening statement to the jury, the prosecutor objected to any statements that the defendant requested an alternative test. Defense counsel pointed out that the defendant's request was "good evidence whether she was or wasn't drunk." He also argued that the fact she was kept in custody unnecessarily was relevant to show that the officers were afraid that if she took a second test the results would be exculpatory.

The trial court ruled that no reference could be made during the trial to evidence of alcohol concentration tests. The court instructed the jury that no chemical test would be admitted and that the jury should draw no inferences for or against either party from the absence of such evidence. The instruction was objected to by the defendant. The trial court's ruling excluded Weiss's testimony about the failure to permit the defendant to be released on bail.

Defense counsel made an offer of proof that defendant would testify that she requested a blood or urine test, and the police refused to provide the test. In addition, she would testify that she called Weiss at 5:00 a.m., processing was completed at that time, and that she was not released until 1:00 p.m. Defense counsel further offered that Weiss would testify that he arrived at the police station at 6:00 a.m. with sufficient bail money, but was not allowed to bail her out right away.

At trial, the arresting officer, Javier Gonzales, testified that at approximately 3:35 a.m., he observed a car going west on West Burnham Street that appeared to be going fast. Upon stopping the vehicle, the officer

asked the defendant if she was all right. The officer observed that the defendant's eyes were red and her speech was slurred. The officer then requested the defendant to exit her car whereupon he noticed that her balance was not steady. She rocked and wobbled back and forth, according to the officer. He also noticed a moderate alcohol odor on her breath.

The officer asked the defendant to recite the alphabet. She got to the letter "P," stopped, and took a tooth out of her mouth. She again tried, but still stopped at the letter "P." The officer then asked the defendant to do a finger-to-nose test. She touched the tip of her nose with the middle of her finger, rather than the finger tip, as requested. She was asked to do a heel-to-toe test, but she was not able to do it correctly. She told the officer she was bowlegged as an explanation for her performance on the latter test.

The defendant's mother testified that the defendant was unsteady on her feet most of the time because she had awkwardly shaped feet. She stated that the defendant was not able to sit up until she was 15 or 16 months old and she has had trouble all her life with unsteadiness.

Other explanations were offered by the defendant's mother for the defendant's apparent signs of intoxication. She claimed that the defendant's bloodshot eyes were caused by prior surgery on an eye and because she has allergies. The defendant also allegedly has speech difficulties because she cannot open her mouth too far.

The jury considered the evidence admitted by the trial court and concluded that the defendant had been driving while under the influence of an intoxicant. The court then sentenced the defendant and this appeal fol-

lowed. The defendant claims that the trial court erred by refusing to dismiss the complaint and by excluding evidence regarding her attempt to secure an alternative alcohol concentration test. The appeal is before this court pursuant to a bypass of the court of appeals, which this court granted under sec. 809.60, Stats.[1]

The defendant's first claim is that prosecution of her for driving while under the influence of intoxicants violates due process because the police denied her access to material evidence. She bases this argument on the fact that the police refused to perform an alternative blood alcohol test and further refused to release her on bail, which prevented her from securing her own alternative test. The defendant maintains that an alternative test might have established prima facie evidence under sec. 885.235, Stats.,[2] that she was not

[1] Section 809.60, Stats., provides as follows:

" **809.60 Rule (Petition to bypass).** (1) A party may file with the supreme court a petition to bypass the court of appeals pursuant to s. 808.05 no later than 10 days following the filing of the respondent's brief under s. 809.19 or response. The petition must include a statement of reasons for bypassing the court of appeals.

" (2) An opposing party may file a response to the petition within 10 days of the service of the petition.

" (3) The filing of the petition stays the court of appeals from taking under submission the appeal or other proceeding.

" (4) The supreme court may grant the petition upon such conditions as it considers appropriate.

· " (5) Upon the denial of the petition by the supreme court the appeal or other proceeding in the court of appeals continues as though the petition had never been filed."

[2] Section 885.235(1)(a)1., Stats., provides as follows:

"**Chemical tests for intoxication.** (1) . . . (a)1. Except as provided in subd. 2, the fact that the analysis shows that there was 0.05% or less by weight of alcohol in the person's blood or 0.05

under the influence of an intoxicant. Because this possible exculpatory evidence is forever unavailable to the defendant due to the police conduct, she claims that it is fundamentally unfair to prosecute her. In essence, she argues that the police conduct denied her the opportunity to present a defense.

In considering the defendant's claim, we initially clarify what is not at issue in this case. The defendant requests dismissal of the charge against her based on alleged deprivation of constitutional rights, rather than deprivation of statutory rights. Section 343.305(5), Stats.,[3] provides that when a person is com-

---

grams of alcohol or less in 210 liters of the person's breath is prima facie evidence that the person was not under the influence of an intoxicant and did not have a blood alcohol concentration of 0.1% or more."

[3] Section 343.305(5), Stats., provides as follows:

" (5) In addition to a test administered upon the request of a law enforcement officer under sub. (2), a person who was the operator of a motor vehicle involved in an accident resulting in great bodily harm or death to any person or a person arrested for a violation of s. 346.63(1) or a local ordinance in conformity therewith, or s. 346.63(2) or 940.25, or s. 940.09 if the offense involved the use of a vehicle, shall be permitted, upon his or her request, the alternative test provided by the agency under sub. (1) or, at his or her own expense, reasonable opportunity to have any qualified person of his or her own choosing administer a chemical test for the purpose specified under sub. (1). If a person has been arrested for such a violation and he or she has not been requested to provide a sample for a test under sub. (2)(b), the person may request a breath test to be administered by the agency or, at his or her own expense, reasonable opportunity to have any qualified person administer any test specified under sub. (2)(b). The failure or inability of a person to obtain a test at his or her own expense shall not preclude the admission of evidence of the results of any test administered under

pelled to submit to a test to determine alcohol concentration, the person is entitled to have an alternative test performed by the police. In *State v. Renard,* 123 Wis. 2d 458, 461, 367 N.W. 2d 237 (Ct. App. 1985), the court of appeals concluded that failure to provide an alternative test did not violate due process, but rather a statutory right. The court of appeals held that the appropriate sanction for violating this statutory right is suppression of the results of the first test performed by the police. The court of appeals specifically stated:

> "Suppression of the blood test is an appropriate sanction for failure to comply with sec. 343.305(5). The duty to perform the requested additional test became mandatory after Renard submitted to a blood test. The circuit court must strictly enforce the statutory right to an additional test. *See Walstad,* 119 Wis. 2d at 527, 351 N.W. 2d at 491.[4] Denial of an additional chemical test effectively prevented discovery of material evidence relating to the prior test. *Id.* at 537, 351 N.W. 2d at 490–91. When an accused is denied a statutory right to discover evidence relating to a chemical test, the proper sanction is suppression of the test results. *See City of Lodi v. Hine,* 107 Wis. 2d 118, 122, 318 N.W. 2d 383, 384 (1982)."

In this case, the trial court suppressed the breathalyzer test result because the state failed to provide an alternative test. The issue therefore is not whether suppres-

---

sub. (2)(b). If a person requests the agency to administer a breath test and if the agency is unable to perform that test, the person may request the agency to perform a test under sub. (2)(b) that it is able to perform. The agency shall comply with a request made in accordance with this subsection."

[4] *State v. Walstad,* 119 Wis. 2d 483, 351 N.W. 2d 469 (1984).

sion is appropriate, but whether the denial of a second test deprived the defendant of constitutionally material evidence, and thereby required dismissal of the charge. That issue was not considered in the *Renard* decision.

The defendant relies on this court's decision in *State v. Walstad,* 119 Wis. 2d 483, 351 N.W. 2d 469 (1984), to support her claim that an alternative test is essential to due process. We stated in *Walstad* at 527 that the opportunity for an alternative test is an assurance of due process. We repeated our conclusion that an alternative test is an "internal safeguard of due process" in *State v. Ehlen,* 119 Wis. 2d 451, 457, 351 N.W. 2d 503 (1984), and *State v. Disch,* 119 Wis. 2d 461, 479–80, 351 N.W. 2d 492 (1984). From these decisions, the defendant reasons that the state denies due process whenever it fails to provide an alternative test. She further concludes that dismissal of charges is the necessary sanction for a due process violation.

The defendant incorrectly relies on the *Walstad* decision to support her claim that the charge against her should be dismissed. First, *Walstad* stands for the proposition that a second test is a due process safeguard only because it permits impeachment of a prior alcohol concentration test result. "The second test affords the defendant the opportunity to scrutinize and verify or impeach the results of the breathalyzer test administered by enforcement authorities." *Id.* at 527. In this respect, the right to a second test was identified as only one of several ways to attack the reliability of a first test. We identified other assurances of reliability including the right to inspect the test equipment and to cross-examine the test operator. Thus, *Walstad* establishes the importance of a second test as a means

to guarantee the fair use of a first test. That concern is not at issue in this case because the trial court suppressed the breathalyzer test result. As a result, an alternative test would have no relevant bearing on the reliability of the excluded test result.

■ The defendant also incorrectly relies on *Walstad* for the proposition that dismissal is the appropriate sanction for all due process violations. Although *Walstad* held that the state did not violate due process by destroying a used breathalyzer ampoule, the sanction in that case if due process had been violated was only suppression of the state's breathalyzer test result. Similarly, the sanction considered in *Ehlen* and *Disch* for destruction or nonpreservation of evidence was suppression of state evidence, rather than dismissal of charges. The defendant therefore incorrectly argues that dismissal is mandatory whenever the state violates due process. Because due process is a test of fundamental fairness, *Disch,* 119 Wis. 2d at 469, dismissal is only required when a due process violation cannot be remedied by less drastic sanctions.

We conclude that *Walstad* does not mandate dismissal of charges when the state fails to provide an alternative blood alcohol test. Our interpretation of *Walstad* does not end our inquiry in this case, however, because that decision did not consider the related question of whether an alternative test is required for purposes other than impeaching a state conducted alcohol concentration test. The defendant specifically alleges that an alternative test might have had exculpatory value, regardless of whether the state was allowed to introduce the breathalyzer test result. The defendant bases this argument on the fact that a chemical test

for intoxication which shows that there was .05 percent or less blood alcohol concentration is prima facie evidence that the person was not under the influence of intoxicants. Section 885.235(1)(a)1, Stats. The defendant assumes that the alternative test would have indicated such a low blood alcohol concentration.

The Supreme Court has stated the relevant test for determining whether sanctions are required when a defendant is denied access to evidence. In *United States v. Valenzuela-Bernal*, 458 U.S. 858 (1982), the Supreme Court considered whether a defendant was denied due process when the federal government deported a potential witness in a criminal trial. The Court analyzed the case as raising a general "access to evidence" problem. The Court defined the due process standard in terms of:

> " '[T]hat fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial.' " *Id.* at 872, quoting *Lisenba v. California*, 314 U.S. 219, 236 (1941).

The Court then applied this general test to the specific facts of an access to evidence case:

> "Because prompt deportation deprives the defendant of an opportunity to interview the witnesses to determine precisely what favorable evidence they possess, however, the defendant cannot be expected to render a detailed description of their lost testimony. But this does not, as the Court of Appeals concluded, relieve the defendant of the duty to make some showing of materiality. Sanctions may be imposed on the Government for deporting

290

witnesses only if the criminal defendant makes a plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses. In some cases such a showing may be based upon agreed facts, and will be in the nature of a legal argument rather than a submission of additional facts. In other cases the criminal defendant may advance additional facts, either consistent with facts already known to the court or accompanied by a reasonable explanation for their inconsistency with such facts, with a view to persuading the court that the testimony of a deported witness would have been material and favorable to his defense." *Id.* at 873.

The Court further explained the test in terms of the traditional "materiality" concept used in cases involving suppressed or destroyed evidence:

"As in other cases concerning the loss of material evidence, sanctions will be warranted for deportation of alien witnesses only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact. See *Giglio v. United States,* 405 U.S. 150, 154 (1972). In making such a determination, courts should afford some leeway for the fact that the defendant necessarily proffers a description of the material evidence rather than the evidence itself. Because determinations of materiality are often best made in light of all of the evidence adduced at trial, judges may wish to defer ruling on motions until after the presentation of evidence." *Id.* at 873–74.

The *Valenzuela-Bernal* test requires a defendant to allege how unavailable evidence might be favorable. The defendant then must convince the court of the like-

lihood that the unavailable evidence would be favorable and sufficiently important to affect the judgment of the trier of fact. An example of how this test is applied, when the defendant does not know what the missing evidence would indicate, is found in *California v. Trombetta*, 467 U.S. 292, 104 S. Ct. 2528 (1984). *Trombetta* raised the question whether a state must preserve breath samples in order that a defendant can have a second chemical test for intoxication performed to verify or impeach the state's own test results. The Court stated that:

> "Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, see *United States v. Agurs*, 427 U.S. at 109–110, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and also be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 2534.

The Court then evaluated whether a second test "would possess an exculpatory value that was apparent before the evidence was destroyed" by considering the reliability of the state's testing procedure. The Court concluded that the Omicron Intoxilyzer, a device used to measure blood alcohol concentration, was sufficiently reliable that it was unlikely a second test would be exculpatory. In fact, based on the Intoxilyzer's reliability, the Court concluded that a second test likely would be inculpatory. The Court analyzed the defendant's duty to show that the second test would be exculpatory in the following language:

"Although the preservation of breath samples might conceivably have contributed to respondents' defenses, a dispassionate review of the Intoxilyzer and the California testing procedures can only lead one to conclude that the chances are extremely low that preserved samples would have been exculpatory. The accuracy of the Intoxilyzer has been reviewed and certified by the California Department of Health. To protect suspects against machine malfunctions, the Department has developed test procedures that include two independent measurements (which must be closely correlated for the results to be admissible) bracketed by blank runs designed to ensure that the machine is purged of alcohol traces from previous tests. See, *supra,* at 2. In all but a tiny fraction of cases, preserved breath samples would simply confirm the Intoxilyzer's determination that the defendant had a high level of blood-alcohol concentration at the time of the test. Once the Intoxilyzer indicated that respondents were legally drunk, breath samples were much more likely to provide inculpatory than exculpatory evidence." *Id.* at 2534–35.

Significantly, the Court also stated that the materiality of the breath samples is directly related to the reliability of the Intoxilyzer. "The degree to which preserved samples are material depends on how reliable the Intoxilyzer is." *Id.* at 2535, n. 10.

*Trombetta* establishes that the constitutional validity of a drunk driving conviction, when the state fails to permit a second alcohol concentration test, ultimately depends on the likely value of a second test. The value of a second test is evaluated in the context of the state's evidence of guilt. Thus, when there is sufficient reliable evidence of guilt and the missing evidence has

293

a low probability of being exculpatory, the omitted evidence is not "material" in the constitutional sense. *Valenzuela-Bernal* defined constitutional materiality in terms of the likelihood that the missing evidence would affect the judgment of the trier of fact. In a subsequent case, *United States v. Bagley,* — U.S. —, 105 S. Ct. 3375, 3384 (1985), the Supreme Court further explained the standard of constitutional "materiality" in cases in which a defendant is denied access to evidence:

> "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."

We conclude that the defendant in this case has not made a plausible showing that an alternative blood alcohol test would be exculpatory. We base this conclusion on the total circumstances of the case, including the reliability of the breathalyzer result and the corroborating evidence of intoxication. In the totality of the circumstances, it is not reasonably probable that a second blood alcohol test would have affected the jury's finding. The probability that a second test would be exculpatory is not sufficient to undermine confidence in the outcome of this case.

The breathalyzer result in this case indicated that the defendant's blood alcohol level was .24 percent. This level is more than twice the legal limit for intoxi-

cation. Section 346.63(1)(b), Stats.[5] We consider the breathalyzer test result to be relevant to evaluating the likelihood that an alternative test would be exculpatory because the breathalyzer, like the Intoxilyzer in *Trombetta,* is a reliable testing device. The tests specified under the implied consent law, including the breathalyzer, are entitled to a prima facie presumption of accuracy. *State v. Neitzel,* 95 Wis. 2d 191, 203, 289 N.W. 2d 828 (1980); *Suspension of Operating Privilege of Bardwell,* 83 Wis. 2d 891, 900, 266 N.W. 2d 618 (1978). Applying the *Trombetta* reasoning, therefore, it is more probable that a second alcohol concentration test would have been inculpatory, rather than exculpatory.

The nonchemical evidence provided by the arresting officer, based on his observations of the defendant, also supports the accuracy of the breathalyzer result, and reduces the likelihood that a second alcohol concentration test would have been exculpatory. The arresting officer's testimony was corroborated by his partner. The testimony of the police officers indicated that the defendant's eyes were red, her breath smelled of alcohol, and her speech was slurred. The defendant's balance was unsteady and characterized by rocking, wobbling and staggering. She performed poorly on coordination tests, including walking heel-to-toe and touching her nose. She could not recite the alphabet past the letter "P," despite two attempts. The defendant

---

[5] Section 346.63(1)(b), Stats., provides as follows:

" **346.63   Operating under influence of intoxicant or other drug.** (1) No person may drive or operate a motor vehicle while:
" (b)    The person has a blood alcohol concentration of 0.1% or more by weight of alcohol in that person's blood or 0.1 grams or more of alcohol in 210 liters of that person's breath."

also allegedly told the partner of the arresting officer that "she was pretty buzzed and she wanted to sit down." Finally, the defendant explained to the officers that she had backed from a corner to a parking spot because she believed she had passed her home. In fact, her house was two blocks ahead of where she parked, thus indicating her disorientation.

The defendant and her mother offered a variety of excuses for the defendant's apparent signs of intoxication. We are unpersuaded, however, that her evidence establishes a reasonable probability that a second alcohol concentration test would have been exculpatory. The jury evaluated the conflicting evidence and resolved the credibility issues in favor of the state, as indicated by its finding that the defendant had been driving while under the influence of intoxicants. The jury finding was not influenced by the breathalyzer result which the trial court suppressed. Thus, the jury believed that the defendant was under the influence of intoxicants as indicated by her conduct, rather than any direct evidence of alcohol concentration. The jury's finding is amply supported by the evidence.

■ The jury finding of physical signs of intoxication, in conjunction with the breathalyzer result indicating extreme intoxication, leaves this court with no basis to conclude that a second alcohol concentration test would have been exculpatory. Our review of the evidence, even knowing that the defendant was denied an alternative test, does not undermine our confidence in the result of this case. The defendant failed to make a plausible showing that an alternative test would have been favorable. As a result, we conclude that the state's failure to provide the defendant with the statu-

torily required alternative test did not deny her access to material evidence, in a constitutional sense. Accordingly, the state did not violate the defendant's due process rights.

We approve the suppression of blood alcohol test results, however, as a sanction for violating a defendant's statutory right to an alternative blood alcohol test. The right to a second test, when a reliable first test is performed, is not required by due process. But, as we stated in *Walstad,* 119 Wis. 2d at 527, a second test does help assure fairness. We cannot say that a second test has absolutely no relevance, unlike retesting of used ampoules. The value of a second test is greatest when the first test fails to conclusively show that a defendant's blood alcohol level exceeded legal limits, *i.e.,* because the blood alcohol level may have increased or decreased since the time of the defendant's arrest. *Id.* at 527, n. 17. A second test also has substantial value when the first test is inconclusive because it is within the margin of error in the testing procedure. We refuse to limit the right to a second test to these circumstances, however, because that is a legislative determination. Thus, we will strictly enforce the right to a second test. *Id.*

Because the legislature intended the second test as a check on the reliability of a first test, we consider suppression of the state's chemical test results to be an appropriate sanction, rather than dismissal. We have previously recognized the appropriateness of suppression as a sanction for the failure to make available statutorily required evidence in *City of Lodi v. Hine,* 107 Wis. 2d 118, 122, 318 N.W. 2d 383 (1982). *California v. Trombetta,* 104 S. Ct. at 2536 n. 12, also specifically ac-

knowledged that legislatures can impose more rigorous standards for admitting scientific evidence than those imposed by the federal constitution.

Our suppression rule is not inconsistent with sec. 343.305(2)(d), Stats., which provides that the rules regulating the taking of blood, breath or urine samples do not limit the right of a law enforcement officer to obtain evidence by any other lawful means. We construe this section to mean that law enforcement officers can secure corroborating evidence of intoxication in ways consistent with the chemical testing procedure. Any other construction would make the chemical testing procedure entirely discretionary, rather than mandatory. We will not construe a statute in such a way as to render part of it superfluous, if such construction can be avoided. *Kollasch v. Adamany,* 104 Wis. 2d 552, 563, 313 N.W. 2d 47 (1981). This construction recognizes that the right to a second test is the legislatively imposed *quid pro quo* for a driver's implied consent to testing for alcohol concentration.

The defendant next argues that she should have been allowed to present evidence at trial that the police officers refused to permit a second alcohol concentration test. She claims that such evidence would have indicated her belief that she was not intoxicated, as well as the police officers' belief that such a test would have been exculpatory. The exclusion of this evidence allegedly prevented the defendant from presenting a defense and therefore violated due process.

We are satisfied that the trial court properly exercised its discretion by excluding evidence that the defendant was denied a second test. Admitting such evi-

dence would have confused the issues before the jury, either by falsely implying that the police refused to perform any blood alcohol test or by prejudicially implying that a prior blood alcohol test was unfavorable to the defendant. Because of the risk of confusion or prejudice, the trial court properly excluded the evidence.[6]

Assuming that the inferences from the proffered evidence are exculpatory, exclusion of the evidence did not violate due process. The defendant was able to present direct evidence that she did not believe she was intoxicated. Furthermore, if the evidence had been admitted to suggest that the police did not believe the defendant was intoxicated, fairness would require that the police be allowed to testify that they did administer a breathalyzer test, in order to rebut the false impression that they refused to perform any test. The evidence before the jury would then show that the police performed one test but refused to perform a second test at the request of the defendant. We cannot conclude that the judgment of the trier of fact probably would have been affected by this evidence. As a result, the trial court did not exclude constitutionally material evidence or violate due process. We conclude that the trial court's ruling did not affect the fundamental fairness of the defendant's trial.

---

[6] Section 904.03, Stats., provides as follows:

" **904.03 Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

*By the Court.*—The judgment of the Milwaukee county circuit court is affirmed.