STATE of Wisconsin, Plaintiff-Respondent,

v.

Gwyn J. JOHNSON, Defendant-Appellant.

Court of Appeals

*No. 01–1092–CR. Submitted on briefs February 12, 2002.— Decided August 29, 2002.*

2002 WI App 224

(Also reported in 652 N.W.2d 642.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Ralph A. Kalal* of *Kalal & Associates* of Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Edwin J. Hughes*, assistant attorney general.

Before Dykman, Roggensack and Deininger, JJ.

¶ 1. ROGGENSACK J. Gwyn J. Johnson was convicted after a court trial of two counts of offering or selling unregistered securities, contrary to WIS. STAT. § 551.21(1) (1999–2000),[1] two counts of making material misrepresentation in connection with the offer or sale of a security, contrary to WIS. STAT. § 551.41(2) and one count of violating an Order of Prohibition, contrary to WIS. STAT. § 551.58(1). He appeals his convictions, contending that he did not offer to sell or sell a security because no written documents were produced that evidence the transactions and because there was no horizontal commonality. He also maintains that none of the factual representations he made, or failed to make, were material. Because we conclude that the evidence was sufficient to prove that Johnson did offer to sell securities, during which he made material misrepresentations, conduct which violated an Order of Prohibition, we affirm all five convictions.

## BACKGROUND

¶ 2. This case centers on loans of substantial sums of money made by Lowell Stuessy because of Johnson's solicitations. Johnson solicited the loans for a business, American Ranger Manufacturing, Inc., that

---

[1] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted. The statutes Johnson violated have been amended since his conviction, but the amendments do not bear upon the disposition of this case.

had as its sole product, a large, earth-moving machine called the American Ranger. The American Ranger was designed to clear brush and trees from land in a sufficiently large swath to facilitate the installation of pipelines and power lines. While several prototypes were built, American Ranger Manufacturing never produced the American Ranger for commercial sales.

¶ 3. Between January of 1990 and May of 1996, Stuessy loaned Johnson at least $270,000. The loans were made after Johnson represented that they would be at least doubled when repaid. Johnson also represented that there were orders for the American Ranger, and he promised he would soon be closing on commercial loans from which he would repay Stuessy. However, there were no sales of the American Ranger and commercial financing was never secured.

¶ 4. Based largely on Stuessy's testimony, Johnson was convicted of five counts of securities fraud. Two convictions were for offering or selling unregistered securities to Stuessy in the period between March 1992 and December 1993 and in the period between January 1996 and May 1996, contrary to Wis. Stat. § 551.21(1). Two convictions were for misrepresentations Johnson made in connection with the offer or sale of securities to Stuessy in the period between March 1992 and December 1993 and in the period between March 1991 and September 1991, contrary to Wis. Stat. § 551.41(2). The fifth conviction involved the violation of a 1995 Office of the Commissioner of Securities' Order of Prohibition, contrary to Wis. Stat. § 551.58(1).

¶ 5. One transaction that occurred in 1991 was a loan of $45,000 by Stuessy to American Ranger Manufacturing in order to assist Johnson in obtaining a $3,000,000 loan from First Bank, N.A. of Milwaukee to

produce American Rangers.[2] In return, Stuessy received a promissory note[3] for $80,000, due and payable when the First Bank loan closed. If the loan did not close, the $45,000 was to be returned. There was no loan closing, but Stuessy's $45,000 was not returned. Stuessy's investment for the First Bank financing was similar to many other investments that Stuessy made in American Ranger Manufacturing, in that it was always represented that he would be repaid at least double the money he loaned and that a commercial business loan or significant sales of the American Ranger were just around the corner.

¶ 6. On November 18, 1992, Johnson wrote to Stuessy offering to sell him $12,500 in debentures in American Ranger Manufacturing as a return for his investment of $5,000.[4] Stuessy made the $5,000 investment, but the debentures were never issued. During 1996, Stuessy regularly loaned money to Johnson for American Ranger Manufacturing. He did so knowing there were financial difficulties, but Johnson continually represented that additional financing from a commercial source was at last at hand. No trial exhibit memorializes the 1996 solicitations to loan money, but

---

[2] This transaction is often referred to as the "Turnbull loan" or "Turnbull transaction."

[3] Trial exhibit 53 contains the 1991 promissory note signed on behalf of American Ranger Manufacturing, Inc. by Johnson, as CEO, and Daniel A. Abandroth, as president.

[4] According to trial exhibit 58, Johnson represented that, "at the time of closing on the offering I will have $12,500 in debentures issued to you that can be cash (sic) at once or held for 3½ yrs and will mature for $120,000.00 with the Public Placement. We need $2,500.00 of the $5,000 today the Bal by the 24[th]. Plus I am going to have a block of stock Issued to you in the Public offering."

it is undisputed that the requests were made orally and that Stuessy made the loans.

¶ 7. During the course of all his solicitations, Johnson omitted many facts that the State contends were material misrepresentations. For example, Johnson did not relate that he was convicted of wire fraud in 1979; that American Ranger Manufacturing had suffered eight years of consecutive losses totaling over $1.5 million during the period of time from 1984 through 1991; or that Johnson was subject to an Order of Prohibition by the Office of the Wisconsin Commissioner of Securities that arose out of his past solicitations of money for American Ranger Manufacturing. Johnson also did not relate that there existed a substantial federal tax liability against American Ranger Manufacturing, assessed in 1993, or that he had transferred intangible assets relating to manufacturing rights and sales for the American Ranger out of American Ranger Manufacturing into American R/W, Inc.

¶ 8. On appeal, Johnson makes three arguments focused on the sufficiency of the evidence: (1) there can be no violation of securities law if all of the representations are made orally and there is no written security prepared; (2) horizontal commonality is required before a transaction involves a security; and (3) because Stuessy was expecting at least a 100% profit on his investments, none of the representations or omissions could have been material to his decision to go through with the loans.

## DISCUSSION

**Standard of Review.**

¶ 9. We will reverse a conviction based on insufficient evidence only if the evidence presented is such

that its probative value and force is, as a matter of law, such that no trier of fact acting reasonably could have found guilt beyond a reasonable doubt. *State v. Poellinger*, 153 Wis. 2d 493, 501, 451 N.W.2d 752, 755 (1990). However, questions of statutory interpretation, such as the meaning of "security" within ch. 551, are questions of law that we review *de novo. State v. Sveum*, 2002 WI App 105, ¶ 5, 254 Wis. 2d 868, 648 N.W.2d 496.

**Violations of Wis. Stat. § 551.21(1).**

¶ 10. Wisconsin Stat. § 551.21(1) is violated by either offering or selling unregistered securities that are not exempt from registration. It is undisputed that what occurred here did not involve an exemption to the requirement of registration. *See* Wis. Stat. § 551.22. Instead, Johnson contends there was no violation because there is no such thing as an "oral security" and the transactions lacked horizontal commonality.[5] We will address each argument in turn.

¶ 11. The term, security, is broadly defined in the Wisconsin Statutes as:

> [A]ny stock; treasury stock; note; bond; debenture; evidence of indebtedness; share of beneficial interest in a business trust; certificate of interest or participation in any profit sharing agreement; collateral trust certificate; pre-organization subscription; transferable share; investment contract; commodity futures contract; voting trust certificate; certificate of deposit for a security;

---

[5] Horizontal commonality is the pooling of interests, not only between the seller and each individual buyer, but also among all those who buy an investment contract in the same venture. *See Wals v. Fox Hills Dev. Corp.*, 24 F.3d 1016, 1018 (7th Cir. 1994).

> limited partnership interest; certificate of interest or participation in an oil, gas or mining title or lease or in payments out of production under such a title or lease; or, in general, any interest or instrument commonly known as or having the incidents of a security or offered in the manner in which securities are offered; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of or option, warrant or right to subscribe to or purchase or sell, any of the foregoing.

WIS. STAT. § 551.02(13)(a). Johnson contends that while there were loans, there were no notes issued to memorialize the terms of the loans on which the two convictions for offering or selling unregistered securities were based.[6] Therefore, no security was involved. However, by its plain terms, WIS. STAT. § 551.21(1) is violated through an offer to sell an unregistered security, even if no sale actually occurs. Therefore, the issuance of a promissory note, debenture or other evidence of indebtedness containing the terms agreed upon when the loan was made is not a necessary element of a violation of § 551.21(1). However, because solicitation to sell a note, debenture or evidence of indebtedness are the terms used in § 551.02(13)(a) which most reasonably fit what Johnson's oral representations promised, we will apply the analysis appropriate to determining whether a note, debenture or other evidence of indebtedness is a security, to Johnson's solicitation.

¶ 12. *Reves v. Ernst & Young*, 494 U.S. 56 (1990), provides a detailed analysis of the test to use in determining whether a note is a security under federal law. *Reves* is instructive because it rejects the test developed

---

[6] A promissory note was issued for the loan made in 1991. However, that loan was not used as a basis for a violation of WIS. STAT. § 551.21(1).

in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), to determine whether the instrument at issue is a security. *Reves*, 494 U.S. at 64. It did so, in part, because, unlike the investment contracts that were at issue in *Howey* where the buyer expected a return by participation in the profits of the enterprise, the return expected on a note might not be derived from profits.[7] A lender often expects an investment to appreciate even if the enterprise has no profits. *See id.* Therefore, a note might not be deemed a security under the *Howey* test, but it would still be within the class of instruments that Congress sought to regulate through the Securities Exchange Act. *Id.*

¶ 13. Instead of the *Howey* test, *Reves* adopted the "family resemblance test" as the framework for analyzing whether a note is a security. *Id.* at 65. In so doing, the Court began with the language used in the statute. *Id.* It concluded that the language chosen established a rebuttable presumption that all notes are securities because "notes" are listed within the definition of a security in the statute. The Court then analyzed that presumption in light of four factors which could rebut the presumption.[8] First, it examined the transaction to determine the motivation that caused the borrower and the lender to enter into it. Second, it examined the "plan of distribution" of the note to determine whether it is

---

[7] Earning a "profit" in *Howey* meant either capital appreciation or participation in earnings, neither of which is a factor when the instrument is a note unless the interest rate on the note is tied to the earnings of the enterprise. *See Reves*, 494 U.S. at 68 n.4.

[8] The Court gives as examples of notes that are not securities, a consumer financing note, a note behind a home mortgage, a short-term note secured by a lien on a small business or its assets, etc. *Reves*, 494 U.S. at 65.

commonly traded for speculation or investment. Third, it examined the reasonable expectations of the investing public. And fourth, it examined whether there was another regulatory scheme or some other factor that significantly reduced the risk of the instrument, thereby causing the application of the securities laws to be unnecessary to protect the public. *Id.* at 66–67.

¶ 14. In concluding that the demand notes issued by the farmers co-op were securities, the Court in *Reves* found most persuasive that, "the Co-Op sold the notes in an effort to raise capital for its general business operations, and purchasers bought them in order to earn a profit in the form of interest." *Id.* at 67–68. The Court concluded that this showing of interest and the fact that the interest paid was higher than would have been paid normally by commercial banks and savings and loans, contributed to showing that the notes were investments in a business enterprise rather than purely commercial or consumer transactions. *Id.* at 68.

¶ 15. In *State v. Mueller*, 201 Wis. 2d 121, 549 N.W.2d 455 (Ct. App. 1996), we adopted the family resemblance framework set out in *Reves* for use in Wisconsin to determine whether the note under consideration was a security within the meaning of Wis. Stat. § 551.02(13)(a). *Mueller*, 201 Wis. 2d at 146–48, 549 N.W.2d at 465–66. The type of analysis applied to a particular instrument differs depending on the nature of the transaction. For example, in *Fore Way Express, Inc. v. Bast*, 178 Wis. 2d 693, 705, 505 N.W.2d 408, 413 (Ct. App. 1993), we adopted the economic realities test to determine whether a particular profit sharing agreement was a security. Because the transactions at issue here are most similar to offering to sell a debt instrument than to other types of transactions that may

746

involve a security, we adopt the family resemblance framework for debt instruments, such as debentures and promises to repay loans made at above market rates, in addition to notes and apply it to the facts of this case.

### *a. The 1992 solicitation.*

¶ 16. For the conviction that arose out of Johnson's 1992 offer to sell Stuessy $12,500 of debentures for $5,000, there is a statutory presumption that the debentures are securities because debentures are listed within the broad class of items included within the definition of a security in WIS. STAT. § 551.02(13)(a). In applying the family resemblance test to that presumption, we note that the debentures were offered to raise capital for American Ranger Manufacturing, not as part of a commercial transaction. The debentures were an investment opportunity for which Stuessy paid $5,000 expecting at least a $12,500 return. Others, in addition to Stuessy, made loans with the expectation of a return significantly higher than the market rate of interest. And finally, there were no risk-reducing factors that would cut against applying the prohibition of WIS. STAT. § 551.21(1)(a) to this transaction.

¶ 17. Johnson also argues that there was no horizontal commonality, so the loans could not have been made to purchase a security. *Howey* required a showing of commonality to prove that the investment contract satisfied the requirement of "a common enterprise." *Howey*, 328 U.S. at 301. However, as pointed out earlier, we have adopted the United States Supreme Court's implementation of the family resemblance test when analyzing debt instruments. The Supreme Court estab-

lished the family resemblance test after rejecting the *Howey* test, for which commonality is an element. Because we have determined that the family resemblance test is the appropriate analysis for a debt instrument under Wisconsin statutes, proof of horizontal commonality is not required in order to have the solicitation to loan money involve a security within the meaning of ch. 551. Accordingly, we conclude that the evidence of Johnson's offer to sell the debentures was sufficient to prove Johnson violated § 551.21(1)(a) because he offered to sell an unregistered security when he offered to sell the debentures.

### b. The 1996 solicitations.

■

¶ 18. For the conviction that arose out of the loans Stuessy made in 1996, we again consider the evidence in the record of how the loans were made. Stuessy continued to send Johnson money based on Johnson's requests. Although, he had no recollection of the specific purpose to which the money would be applied, except to raise capital for American Ranger Manufacturing, Stuessy said he thought that his loans would enable American Ranger Manufacturing to produce American Rangers for sale so that his investment would prove profitable.

¶ 19. The record shows that during 1996 Johnson faxed letters to Stuessy that he had sent to and received from Carl Nunez suggesting that sales of significant numbers of American Rangers were just around the corner and that the long sought return on Stuessy's investments would soon be available through Dupont Financial Services. While the State does not identify a place in the record where it is shown that others made loans in 1996, and we could find none, we do not deem

that part of the *Reves-Mueller* analysis essential because the loans solicited in 1996 were not discrete transactions. Rather, they were part of a pattern of Johnson's solicitations that had been ongoing with Stuessy and others for years. And finally, as with Stuessy's earlier investments, there were no risk-reducing factors that would make the application of WIS. STAT. § 551.21(1) unnecessary. Accordingly, we conclude that the evidence is sufficient to prove Johnson violated § 551.21(1) by his offers to sell a right to receive a significant return on the loans Stuessy made in 1996.

**Violations of WIS. STAT. § 551.41(2).**

█

¶ 20. Johnson was also convicted of making material misrepresentations regarding the loans he solicited in the period between March 1992 and December 1993 and in the period between March 1991 and September 1991. Johnson asserts that because the return Stuessy was promised was so high, sometimes as much as three to one, none of the representations could have been material. He focuses on cases that conclude that a representation is material only if it would have influenced the investor's decision to invest. He cites *State v. McCrossen*, 129 Wis. 2d 277, 385 N.W.2d 161 (1986) and *State v. Woodington*, 31 Wis. 2d 151, 142 N.W.2d 810 (1966).

█

¶ 21. The standard for determining whether a representation is material is an objective standard, wherein the fact finder assesses whether the omitted or misrepresented fact would have made a difference to a reasonable investor's decision to invest. *See Ollerman v.*

*O'Rourke Co.*, 94 Wis. 2d 17, 42, 288 N.W.2d 95, 107 (1980); *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 445 (1976).

¶ 22.　Here, Johnson repeatedly represented that Stuessy would be repaid two to three times the principal amount of his loans. Johnson sent Stuessy letters he wrote to others and letters he received from others that appeared to show that commercial financing and sales for the American Ranger were soon to be available to pay Stuessy all that was promised. Additionally, Johnson never disclosed the back taxes owed to the Internal Revenue Service and the Wisconsin Department of Revenue. He also kept silent about his past fraud conviction and the Order of Prohibition by the Office of the Wisconsin Commissioner of Securities. We conclude that the circuit court, as the fact finder, could have found that these false statements and omissions would have been material to a reasonable investor in deciding whether to invest in American Ranger Manufacturing.

¶ 23.　In regard to Johnson's arguments, he cites *McCrossen*, a case involving a drunk driving conviction that has nothing to do with whether representations are material. *McCrossen*, 129 Wis. 2d at 279–80, 385 N.W.2d at 162. Johnson also cites *Woodington*, which supports his conviction because it explains that an investor has a right to reasonably accurate information, and it is up to the investor then to determine whether he wishes to invest in light of that information. *Woodington*, 31 Wis. 2d at 175, 142 N.W.2d at 822. Accordingly, we conclude that the evidence is sufficient to prove that Johnson repeatedly violated Wis. Stat. § 551.41(2) by his false statements of material facts and by his omission of material facts.

**Violation of Wis. Stat. § 551.58(1).**

¶ 24. On December 29, 1995, the Office of the Commissioner of Securities issued an Order of Prohibition which directed Johnson to refrain from offering or selling a security of any type unless it was registered under ch. 551. Johnson did not contest the order. The State asserts that the violations of Wis. Stat. § 551.21(1) in 1996, already discussed above, prove a violation of Wis. Stat. § 551.58(1) because of the Order of Prohibition was then in effect. Johnson does not contend that if what he offered to sell or sold in 1996 was a security, then the Order of Prohibition was not violated. Therefore, because we have concluded that his solicitations of loans from Stuessy in 1996 violated § 551.21(1), we affirm his conviction for violating § 551.58(1) without addressing this issue further.

## CONCLUSION

¶ 25. Because we conclude that the evidence was sufficient to prove that Johnson did offer to sell securities, during which he made material misrepresentations, conduct which violated the Order of Prohibition, we affirm all five convictions.

*By the Court.*—Judgment affirmed.