STATE of Wisconsin, Plaintiff-Appellant,

v.

Michael S. PIDDINGTON, Defendant-Respondent-
Petitioner.

Supreme Court

*No. 99–1250–CR. Oral argument December 12,
2000.—Decided March 22, 2001.*

2001 WI 24

(Also reported in 623 N.W.2d 528.)

756

758

760

For the defendant-respondent-petitioner there were briefs by *Michele A. Tjader* and *Kalal & Associates*, Madison, and oral argument by *Michele A. Tjader*.

For the plaintiff-appellant the cause was argued by *Kathleen M. Ptacek,* assistant attorney general, with whom on the brief was *James E. Doyle*, attorney general.

An amicus curiae brief was filed by *Keith A. Findley, Michele La Vigne* and the *University of Wisconsin Law School*, on behalf of the Frank J. Remington Center.

¶ 1. N. PATRICK CROOKS, J. Michael Piddington seeks review of a published court of appeals decision that reversed a circuit court order which had suppressed the test results of Piddington's blood for alcohol. *State v. Piddington*, 2000 WI App 44, 233 Wis. 2d 257, 607 N.W.2d 303. Piddington was tested after he was arrested for operating a motor vehicle while under the influence of an intoxicant (OWI). The circuit court had concluded that Piddington, who has been profoundly deaf since birth, needed an American Sign Language interpreter to fully understand the field sobriety tests and the information that he was to be given pursuant to Wisconsin's implied consent law, Wis. Stat. § 343.305(4)(1995–96).[1] The court of appeals reversed, concluding that the law enforcement officer need only "orally inform" Piddington of the required information.[2] *Piddington*, 2000 WI App 44 at ¶ 12. We

---

[1] "Implied consent" refers to the principle that a driver "is deemed to have given consent" to chemical tests for alcohol as a condition of operating a motor vehicle in Wisconsin. Wis. Stat. § 343.305(2)(1995–96).

All references to the Wisconsin Statutes are to the 1995–96 version unless otherwise noted.

[2] The version of Wis. Stat. § 343.305(4)—the 1995–96 version—that was in effect at the time that Piddington was arrested reads as follows:

(4) Information. At the time a chemical test specimen is requested under sub. (3) (a) or (am), the person shall be orally informed by the law enforcement officer that:

(a) He or she is deemed to have consented to tests under sub. (2);

disagree with the court of appeals' approach regarding the implied consent warnings contained in § 343.305(4).[3] We hold that § 343.305(4) requires the arresting officer under the circumstances facing him or her at the time of the arrest, to utilize those methods which are reasonable, and would reasonably convey the implied consent warnings. In determining whether the arresting officer has used reasonable methods which would reasonably convey the necessary information in light of the pertinent circumstances, the focus rests upon the conduct of the officer. We thus agree

(b) If testing is refused, a motor vehicle owned by the person may be immobilized, seized and forfeited or equipped with an ignition interlock device if the person has 2 or more prior suspensions, revocations or convictions within a 10-year period that would be counted under s. 343.307 (1) and the person's operating privilege will be revoked under this section;

(c) If one or more tests are taken and the results of any test indicate that the person has a prohibited alcohol concentration and was driving or operating a motor vehicle, the person will be subject to penalties, the person's operating privilege will be suspended under this section and a motor vehicle owned by the person may be immobilized, seized and forfeited or equipped with an ignition interlock device if the person has 2 or more prior convictions, suspensions or revocations within a 1–10-year period that would be counted under s. 343.307 (1); and

(d) After submitting to testing, the person tested has the right to have an additional test made by a person of his or her own choosing.

[3] Herein, the term "implied consent warnings" refers to the information the legislature has directed law enforcement to convey to drivers accused of OWI pursuant to Wis. Stat. § 343.305(4). That information includes: (a) a brief explanation of the nature of implied consent; (b) a warning about the consequences of refusing to submit to a chemical test to determine alcohol concentration in the blood; (c) a warning about the consequences of a prohibited concentration of alcohol in the blood; and (d) the right to request an alternative test.

with that part of the circuit court's findings that "the attempts of law enforcement to communicate with the defendant were reasonable under all the circumstances, perhaps even exemplary. . . ." (R. at 28:1–2.) The law enforcement officers here used reasonable methods to convey the required implied consent warnings, and, accordingly, we affirm the court of appeals. The test results should not have been suppressed.

## I

¶ 2. The facts are largely undisputed. On February 14, 1998, at approximately 1:00 a.m., a Wisconsin State Patrol trooper patrolling U.S. Highway 51 in Madison observed in front of him a pickup truck speeding and drifting from lane to lane. When the pickup truck made an abrupt swerve, the trooper stopped him. Piddington, who has been severely deaf since birth, and his passenger indicated to the trooper that Piddington was deaf. The trooper told Piddington through the passenger (acting as an interpreter) that he was going to have Piddington perform field sobriety tests after he checked Piddington's license.

¶ 3. When the trooper returned, the passenger told the trooper that Piddington wanted to know why he had been stopped. The trooper wrote the reason on his pad, and, for the remainder of the stop, used notes, gestures and some speaking to communicate with Piddington.[4] The trooper had contacted dispatch to track down a law enforcement officer who knew sign language, but was informed that no one was available. Piddington had asked both at the beginning of the stop,

---

[4] The trooper indicated that he had intended to have the passenger continue to interpret, but he had the passenger return to the car when he found that he did not need the passenger to interpret in order to communicate with Piddington.

and also later during the stop, for a sign language interpreter, and the trooper told him that no one was yet available. Piddington, however, had also indicated that he could speech-read, colloquially known as "reading lips."

¶ 4. Piddington admitted that he had been drinking. The trooper saw that Piddington's eyes were glassy and that there was a strong odor of alcohol about him. The trooper had Piddington perform sobriety tests, including the horizontal gaze nystagamus (follow the pen tip with the eyes) test and the walk-and-turn test. The trooper instructed Piddington through oral and written instructions, as well as demonstrating the tests for him.

¶ 5. Based upon Piddington's performance in these two tests, the trooper concluded that he was impaired, and had him perform a preliminary breath test to determine Piddington's blood alcohol concentration. Again, the trooper gave both written instructions and a demonstration. The result was 0.27. The trooper then placed Piddington under arrest for OWI. The trooper handcuffed Piddington with his hands in front so that he could continue to write notes, and sign, should an officer with sign language capability became available. As the trooper was preparing to take Piddington to State Patrol headquarters for a breathalyzer test, he learned that a Madison police officer who had some working knowledge of sign language had become available, and arranged to meet her at Patrol headquarters. En route to headquarters Piddington requested, through a note, to have a blood test. Consequently, the trooper took him to Meriter Hospital, and met the Madison police officer there.

¶ 6. The officer was not a certified American Sign Language (ASL) interpreter, but knew some sign lan-

guage, and she and Piddington communicated by sign and orally. Piddington was given an Informing the Accused form,[5] and told to read it and initial each paragraph only if he understood it. (Piddington had told the Madison police officer that he graduated from high school and could read and write.) He read it and initialed to the left of each applicable paragraph. The State Patrol trooper also attempted to read the form

---

[5] The Informing the Accused form used here was generated by the Wisconsin Department of Transportation and based upon § 343.305(4). It reads in pertinent part as follows:

When a Law Enforcement Officer requests that you submit to a chemical test, pursuant to Wisconsin's Implied Consent Law, the officer is required to inform you of the following:

Section A

(applies to everyone)

1. You are deemed under Wisconsin's Implied Consent Law to have consented to chemical testing of your breath, blood or urine at this Law Enforcement Agency's expense. The purpose of testing is to determine the presence or quantity of alcohol or other drugs in your blood or breath.

2. If you refuse to submit to any such tests, your operating privilege will be revoked.

3. After submitting to chemical testing, you may request the alternative test that this law enforcement agency is prepared to administer at its expense or you may request a reasonable opportunity to have any qualified person of your choice administer a chemical test at your expense.

4. If you take one or more chemical tests and the result of any test indicates you have a prohibited alcohol concentration, your operating privilege will be administratively suspended in addition to other penalties which may be imposed.

5. If you have a prohibited alcohol concentration or you refuse to submit to chemical testing and you have two or more prior suspensions, revocations or convictions within a 10 year period and after January 1, 1988, which would be counted under s. 343.307(1) Wis. Stats., a motor vehicle owned by you may be equipped with an ignition interlock device, immobilized, or seized and forfeited.

aloud to Piddington, but Piddington responded by indicating that he could not read his lips.[6] The Madison police officer read it to Piddington, instead, without objection. The officer told Piddington to indicate whether or not he would submit to a blood test and initial his response. Piddington indicated that he would submit to a blood test. The result was 0.206.

¶ 7. Piddington was subsequently charged with OWI in violation of Wis. Stat. § 346.63(1)(a) and with having a prohibited alcohol concentration in violation of § 346.63(1)(b).

¶ 8. Piddington made a number of motions to suppress. At the suppression hearing, he testified that he has difficulty speech-reading, and that his primary form of communicating is ASL. He also testified that he needed an ASL interpreter to fully understand both the trooper's instructions for the sobriety test and the Informing the Accused form.

¶ 9. The State Patrol trooper testified that there were times when it was difficult to communicate with Piddington, but that he made sure that Piddington understood what the trooper was communicating and would not proceed until Piddington indicated that he understood. The trooper also admitted that he had been more lenient in evaluating Piddington's performance on the sobriety tests than he would have been with hearing drivers given the difficulty communicating.

¶ 10. Dane County Circuit Court Judge Daniel R. Moeser found that there was probable cause for Piddington's arrest, but granted the motions to suppress

---

[6] Piddington had indicated earlier in the stop that he could read the trooper's lips. The trooper subsequently testified that Piddington had become uncooperative with him when they reached the hospital.

the blood alcohol test and statements Piddington made after his arrest. The circuit court found that "the attempts of law enforcement to communicate with the defendant were reasonable under all the circumstances, perhaps even exemplary." (R. at 28:1–2.) However, according to the court, those attempts were nonetheless insufficient to meet the State's burden to show that Piddington had been informed regarding his right to an alternative test and other information contained in the Informing the Accused form. According to the circuit court, "the defendant needed an [ASL] interpreter to really understand the information he was being given. . . ." (R. at 28:2.)

¶ 11. The State appealed, and the court of appeals reversed. *Piddington*, 2000 WI App 44. The court of appeals concluded that Wis. Stat. § 343.305(4) "requires nothing more than that an arresting officer 'orally inform' an [OWI] arrestee of the required information." *Id.* at ¶ 12. In granting Piddington's petition for review, we additionally ordered the parties to address the equal protection issue raised in an *amicus* brief filed in this case by the University of Wisconsin Law School Frank J. Remington Center.

## II

¶ 12. Piddington's objections to the court of appeals' decision are based in both statutory and constitutional interpretations. Piddington contends that the law enforcement officer violated Wis. Stat. § 343.305(4) because the officer did not provide him with an ASL interpreter. Piddington also contends that the absence of an ASL interpreter violated the constitutional principles of due process and equal

protection.[7] Alternatively, according to Piddington, the circuit court correctly suppressed his blood test results because he asked for, and did not receive, an alternate test.

¶ 13. What Wis. Stat. § 343.305(4) required of the State Patrol trooper is a question of statutory interpretation. "Application of the implied consent statute to an undisputed set of facts, like any statutory construction, is a question of law that this court reviews *de novo*." *State v. Reitter*, 227 Wis. 2d 213, 223, 595 N.W.2d 646 (1999). Similarly, reconciling constitutional considerations of due process and equal protection with the requirements of the implied consent statute involve questions of law, which we also review *de novo*. *Id.*

A

¶ 14. We address each of Piddington's contentions in turn, starting with considering whether the State Patrol trooper complied with, or violated, the requirements of Wis. Stat. § 343.305(4). The focal point of all statutory interpretation is discerning the intent of the legislature. *Milwaukee County v. DILHR*, 80 Wis. 2d 445, 451, 259 N.W.2d 118 (1977). In searching for legislative intent, we start with the language of the statute. *Kelley Co. v. Marquardt*, 172 Wis. 2d 234, 247, 493 N.W.2d 68 (1992). If the plain meaning of the stat-

---

[7] Connected to his equal protection argument is Piddington's contention that the federal Rehabilitation Act of 1973 and the Americans with Disabilities Act, and State Patrol policies mandate reasonable accommodation of hearing impaired persons. Consequently, according to Piddington, requiring the State to provide an ASL interpreter here would not further burden the State beyond what it is already required to provide.

ute is self-evident, we look no further. *UFE, Inc. v. LIR C*, 201 Wis. 2d 274, 281, 548 N.W.2d 57 (1996). Where a statute is ambiguous, that is, "reasonable minds could differ as to its meaning," the court examines further into the scope, history, context, subject matter and purpose of the statute in question. *Harnischfeger Corp. v. LIRC*, 196 Wis. 2d 650, 662, 539 N.W.2d 98 (1995); *See also UFE, Inc.*, 201 Wis. 2d at 282.

¶ 15. The term "informed," as in "the person [who is requested to submit to a chemical test] shall be orally informed by the law enforcement officer," in the introduction of Wis. Stat. § 343.305(4) is capable of two different meanings. The court of appeals interpreted § 343.305(4) to mean that "an arresting officer [need only] 'orally inform[ ]' an arrestee of the correct required information." *Piddington*, 2000 WI App 44, ¶ 15 (footnote omitted). The State agrees with that interpretation here. Piddington takes the opposite approach, contending that § 343.305(4)'s mandate to "inform" requires more than merely reading the implied consent warnings to a deaf driver, who would be unlikely, based on such an approach, to comprehend them. According to Piddington, in this case, law enforcement could comply with § 343.305(4) only by providing an ASL interpreter.

¶ 16. Neither the State's nor Piddington's interpretation of Wis. Stat. § 343.305(4) is unreasonable. Where "reasonable minds could differ as to [the] meaning" of a statute, that statute is ambiguous. *Harnischfeger*, 196 Wis. 2d at 662. Here, as in *State v. Zielke*, 137 Wis. 2d 39, 45, 403 N.W.2d 427 (1987), where the State argued that § 343.305 did not provide the only means for police to obtain admissible evidence

of blood alcohol concentration and Zielke argued that it did, "[t]he opposing interpretations of the implied consent law advanced by the parties demonstrate the ambiguity of the statute." Because precisely what the language of § 343.305(4) requires of law enforcement is ambiguous, we look beyond the text to its scope, history, context, subject matter, and purpose to determine the legislature's intent. *UFE, Inc.*, 201 Wis. 2d at 282. The "court. . .presume[s] the legislature intended an interpretation that advances the purposes of the statute." *Zielke*, 137 Wis. 2d at 46.

¶ 17. The purpose behind the implied consent law is to combat drunk driving by "facilit[ating] the gathering of evidence against drunk drivers." *State v. Neitzel*, 95 Wis. 2d 191, 203, 289 N.W.2d 828 (1980). "With this intent in mind we proceed to an interpretation of the statute considering the. . .object of the statute, mindful that the court must liberally construe the law to effectuate the legislature's intent." *Zielke*, 137 Wis. 2d at 47. The specific objective of Wis. Stat. § 343.305(4) within the implied consent statutory scheme is to "advise the accused about the nature of the driver's implied consent." *Reitter*, 227 Wis. 2d at 225. Section 343.305(4) warns drivers of the consequences of test results indicating an alcohol concentration of greater than 0.10 as well as the consequences of refusing to submit to testing. *State v. Muente*, 159 Wis. 2d 279, 281–82, 464 N.W.2d 230 (Ct. App. 1990); *see also* § 340.01(46m)(a). In addition, § 343.305(4)(d) notifies the driver of the right to request a second, alternative test to the one requested by the arresting officer. "[T]he legislation requires that an apprehended driver *be advised* of the absolute right to a second test. This is a legislatively conferred right which we will strictly pro-

tect." *State v. Walstad*, 119 Wis. 2d 483, 527, 351 N.W.2d 469 (1984) (emphasis added).

¶ 18. We turn to how to best ensure that law enforcement officers comply with the legislature's mandate requiring that apprehended drivers are informed about their rights and responsibilities under the implied consent law. Previous decisions have addressed the sufficiency of the implied consent warnings given to the accused drivers. *See, e.g., Reitter*, 227 Wis. 2d 213; *Village of Oregon v. Bryant*, 188 Wis. 2d 680, 524 N.W.2d 635 (1994); *State v. Crandall*, 133 Wis. 2d 251, 394 N.W.2d 905 (1986).[8] None of these decisions addressed the manner in which the law enforcement officer conveyed the information, or whether that method reasonably conveyed that information. The instant case implicates more than "*what* must be told persons when requesting them to take a breathalyzer test." *Crandall*, 133 Wis. 2d at 259 (emphasis added). Instead, this case implicates *how* persons are given the implied consent warnings, that is, the methods used to convey those warnings. Nonetheless, the previous decisions are "founded on a simple premise: the implied consent warnings are designed to inform drivers of the rights and penalties applicable to

---

[8] This court has also considered the sufficiency of the Informing the Accused form, a form developed by the Wisconsin Department of Transportation to assist law enforcement officers in giving accused drivers the implied consent warnings. *See Village of Oregon v. Bryant*, 188 Wis. 2d 680, 692, 524 N.W.2d 635 (1994). We have found that the Informing the Accused forms, including the form used here, "accurately informed" or "adequately alert[ed]" accused drivers about "the testing process and the consequences of refusal," *State v. Reitter*, 227 Wis. 2d 213, 240, 595 N.W.2d 646 (1999) (citing *Bryant*, 188 Wis. 2d at 692).

them." *County of Ozaukee v. Quelle*, 198 Wis. 2d 269, 279, 542 N.W.2d 196 (Ct. App. 1995). This same principle applies here.

¶ 19. The *Quelle* court concluded that there was a functional similarity between the statutory mandate regarding implied consent warnings and the constitutional mandate regarding *Miranda* rights. *Quelle*, 198 Wis. 2d at 277–78. Insofar as the objective of both is to inform the accused, "the warnings provided drivers under the implied consent law are analogous to those employed in *Miranda*-type cases." *Id.* at 276.

¶ 20. In an analogous situation, where a law enforcement officer gave an arrestee *Miranda* warnings in Spanish, this court indicated that, in determining whether the arrestee was properly advised of his *Miranda* rights, the pertinent "inquiry is whether the warnings reasonably convey the *Miranda* rights." *State v. Santiago*, 206 Wis. 2d 3, 12 n.6, 556 N.W.2d 687 (1996) (citations omitted).[9] Yet, even though there is a functional similarity between the implied consent and *Miranda* warnings, there are significant distinctions that dictate that an accused driver need not comprehend the implied consent warnings for the warnings to have been reasonably conveyed.[10] In

---

[9] In *State v. Santiago*, 206 Wis. 2d 3, 21, 556 N.W.2d 687 (1996), we concluded that the record was incomplete, and thus we could not determine whether the defendant had been "properly advised of" or "knowingly and intelligently waive[d] the *Miranda* rights" because of the foreign-language *Miranda* warnings given.

[10] First, *Miranda* warnings are based upon the United States Constitution (*see Dickerson v. United States*, 530 U.S. 428 (2000); the implied consent warnings are based upon Wis-

short, "*Miranda* rules do not apply because [the] request to submit to a chemical test does not implicate testimonial utterances." *Reitter*, 227 Wis. 2d at 225. Consequently, there are no rights that the arrestee can or must knowingly and intelligently waive before the chemical testing proceeds, and no concomitant need for the accused driver to understand the warnings. *See id.*

¶ 21. In consideration of the differences between the implied consent warnings and the *Miranda* warnings, the determination of whether the law enforcement officer reasonably conveyed the implied consent warnings is based upon the objective conduct of that officer, rather than upon the comprehension of the accused driver. This approach ensures that the driver cannot subsequently raise a defense of "subjective confusion," that is, whether the implied consent warnings were sufficiently administered must not depend upon the perception of the accused driver. *Reitter*, 227 Wis. 2d at 229; *Quelle*, 198 Wis. 2d at 280–81. Whether the implied consent warnings have been reasonably conveyed is not a subjective test; it does not "require assessing the *driver's perception* of the infor-

consin statutes. Second, the purpose of *Miranda* warnings is to ensure that the arrestee comprehends his or her constitutional rights so that those rights can be knowingly and intelligently waived. *Santiago*, 206 Wis. 2d at 18–19. The purpose of the implied consent warnings is to inform the accused driver about implied consent and alert him or her to the statutory right to request an alternative test. *Reitter*, 227 Wis. 2d at 225. The right to request an alternative test is not a right that must be waived before the officer proceeds with testing; rather, the right to request a second test arises after the requested test has been completed. Wis. Stat. § 343.305(4)(d).

mation delivered to him or her." *Quelle*, 198 Wis. 2d at 280 (emphasis in original).

¶ 22. Despite the significant distinction between *Miranda* and implied consent warnings, they share the common purpose of informing the accused. Considering that similarity, we conclude that whether law enforcement officers have complied with Wis. Stat. § 343.305(4) turns on whether they have used reasonable methods which would reasonably convey the warnings and rights in § 343.305(4). As in *Miranda*-type cases, the State has the burden of proof of showing, by a preponderance of the evidence, that the methods used would reasonably convey the implied consent warnings. *See Santiago*, 206 Wis. 2d at 19.[11] Also, in the implied consent setting, as well as in the *Miranda* setting, the onus is upon the law enforcement officer to reasonably convey the implied consent warnings. *See id.*

¶ 23. Whether the implied consent warnings given sufficiently comply with Wis. Stat. § 343.305(4) depends upon the circumstances at the time of the arrest; correspondingly, whether the methods used were reasonable and would reasonably convey those warnings also depends upon the circumstances facing the arresting officer. *See, e.g., State v. Geraldson*, 176

---

[11] The initial burden of showing that law enforcement officers used those methods which would reasonably convey the implied consent warnings rests with the State. Then, the burden shifts to the accused driver to show "one, that the officer misstated the warnings, or otherwise misinformed the driver, and two, that the officer's misconduct impacted his or her ability to make the choice available under the law." *County of Ozaukee v. Quelle*, 198 Wis. 2d 269, 278, 542 N.W.2d 196 (Ct. App. 1995).

Wis. 2d 487, 500 N.W.2d 415 (Ct. App. 1993).[12] The purpose of Wis. Stat. § 343.305(4) to inform an accused driver, is fulfilled, rather than undermined, if the law enforcement officer must use reasonable methods that reasonably convey the implied consent warnings, in consideration of circumstances facing him or her. This interpretation ensures that an accused driver is properly advised under the implied consent law, without raising the specter of subjective confusion.[13] Accordingly, we find that the legislature intended that law enforcement officers inform accused drivers of the implied consent warnings, and that duty is met by using those methods which are reasonable and reasonably convey those warnings under the circumstances at the time of the arrest.

¶ 24. The legislative history of Wis. Stat. § 343.305(4) bolsters the conclusion that the legislature intended that law enforcement officers are to convey the implied consent warnings using those methods which reasonably assure access to those warnings. In 1985, the pertinent language read "shall inform." In 1987, the legislature substantially revised Wis. Stat.

[12] In *Geraldson*, the implied consent warnings given were insufficient because the officer failed to give the accused driver those warnings that applied to the driver who held a commercial vehicle license. *State v. Geraldson*, 176 Wis. 2d 487, 495, 500 N.W.2d 415 (Ct. App. 1993). The officer failed to take into account a known, pertinent circumstance that affected the giving of the implied consent warnings, namely, the existence of the commercial vehicle license.

[13] Our holding here does not affect the exception to the implied consent warning mandate where the driver is unconscious or "otherwise not capable of withdrawing consent." Wis. Stat. § 343.305(3)(b). "A person who is unconscious or otherwise not capable of withdrawing consent is presumed not to have withdrawn consent under this subsection. . . ." *Id.*

§ 343.305, and created subsection (4). 1987 Wis. Act 3, § 29. Subsection (4) was originally drafted to read that "[a]t the time a chemical test specimen is requested. . .the person shall be informed." The Senate amended this phrase to substitute "shall be orally informed by the law enforcement officer" for "shall be informed," the language at issue here. Senate Amendment 2 to 1987 A.B. 30.

¶ 25. In 1994, this court suggested that Informing the Accused forms "used by the Department of Transportation could be simplified." *Bryant*, 188 Wis. 2d at 692. Given that "the recipient of the information, has been determined, to a degree of probable cause, to be under the influence of alcohol," "reasonableness under the circumstances dictates that the directions and warnings to the accused be as simple and straightforward as possible." *Id.* at 693. The Department of Transportation concurred with this court's observation about the implied consent warnings.

> The complex instructions that are statutorily required has led to the development of a fairly complex form that is read to each accused drunk driver. . . . The current Informing the Accused form balances court. . .decisions in an attempt to provide the statutorily required disclosures in a straightforward manner. Nonetheless, it is not an easy document for sober people to understand, much less a person who is intoxicated, such as a person arrested for OWI.

Memorandum from John J. Sobotik, Assistant General Counsel, Wisconsin Department of Transportation, to Rep. John La Fave, dated November 14, 1995, Re: Informing the Accused Form.[14]

---

[14] Even though the legislature may have considered that the implied consent warning forms may not be easy for an intox-

¶ 26. The year after *Bryant*, both the executive and the legislative branches took steps to simplify the implied consent warnings. "The Governor's 1995 Task Force on OAR/OWI strongly recommended that the form be rewritten *using simple English*." Memorandum from Rep. John La Fave to Don Salm, dated February 6, 1997, Re: "Informing the Accused" workgroup (emphasis in original). In February 1997, Representative La Fave organized an informal committee to examine the Informing the Accused form. *Id.* In August 1997, Representative La Fave and others introduced legislation that set forth the implied consent warnings in plain and direct language.[15]

---

icated person to understand, there is no indication that the legislature intended that the mental processes of an intoxicated driver are to be taken into account in determining compliance with Wis. Stat. § 343.305(4). We agree with the court of appeals that "since the statute requires the information to be provided only to persons who are probably intoxicated, it is unlikely that the legislature intended a persons' understanding or comprehension of the information to be determinative of compliance with the statute." *State v. Piddington*, 2000 WI App 44, ¶ 15, 233 Wis. 2d 257, 607 N.W.2d 303. However, the issue at hand is whether an officer has to give deaf persons the same opportunity to understand the implied consent warnings as a hearing, English-speaking persons, regardless of the extent to which their intoxication may interfere with their mental processes. Reasonable methods which reasonably convey the implied consent warnings afford that opportunity.

[15] The amended version reads as follows:

INFORMATION. At the time that a chemical test specimen is requested under sub. (3) (a) or (am), the law enforcement officer shall read the following to the person from whom the test specimen is requested:

"You have either been arrested for an offense that involves driving or operating a motor vehicle while under the influence of alcohol or

¶ 27. That legislation, 1997 Assembly Bill 467, was enacted as 1997 Wisconsin Act 107 on April 14, 1998, effective August 1, 1998, after Piddington's arrest. 1997 Wis. Act 107, § 9. Even though the revision is not applicable here, the changes elucidate the legislature's intent. Evident in the amendment to Wis. Stat. § 343.305(4) is the legislature's intent to place the onus upon the law enforcement officer to convey the implied consent warnings. That is, "the law enforcement officer shall read the following to the person from whom the test specimen is requested. . .[etc.]." Wis. Stat. § 343.305(4) (1997–98). Also evident is the intent to simplify the warnings so as to facilitate the officers' delivery of them. Just as the text should facilitate the driver's receipt of the warnings, the methods employed to deliver those warnings should not unreasonably obstruct their comprehension. Indeed, by simplifying the implied consent warnings, the legislature indicated

drugs, or both, or you are suspected of driving or being on duty time with respect to a commercial motor vehicle after consuming an intoxicating beverage.

This law enforcement agency now wants to test one or more samples of your breath, blood or urine to determine the concentration of alcohol or drugs in your system. If any test shows more alcohol in your system than the law permits while driving, your operating privilege will be suspended. If you refuse to take any test that this agency requests, your operating privilege will be revoked and you will be subject to other penalties. The test results or the fact that you refused testing can be used against you in court.

If you take all the requested tests, you may choose to take further tests. You may take the alternative test that this law enforcement agency provides free of charge. You also may have a test conducted by a qualified person of your choice at your expense. You, however, will have to make your own arrangements for that test.

If you have a commercial driver license or were operating a commercial motor vehicle, other consequences may result from positive test results or from refusing testing, such as being placed out of service or disqualified."

that every reasonable means should be employed to ensure that the warnings are being conveyed—whether that requires that the law enforcement officer reads the warnings aloud, or uses another method.[16]

¶ 28. That a law enforcement officer must use reasonable methods to convey the implied consent warnings does not mean the officer must take extraordinary, or even impracticable measures to convey the implied consent warnings. Reasonableness under the circumstances also requires consideration of the fact that alcohol dissipates from the blood over time, particularly after the subject has stopped drinking. *State v. Bohling*, 173 Wis. 2d 529, 533, 494 N.W.2d 399 (1993); *see also* Wis. Stat. § 885.235 (blood test result is automatically admissible if blood is taken within three (3) hours of the stop). The State cannot be expected to wait indefinitely to obtain an interpreter and risk losing evidence of intoxication. Such would defeat, rather than advance, the intent of the implied consent law "to facilitate the gathering of evidence against drunk drivers in order to remove them from the state's highway." *Zielke*, 137 Wis. 2d at 46. The approach we adopt today only ensures that barriers which may affect the arresting officer's ability to reasonably convey the implied consent warnings to an

---

[16] Accordingly, we find no significance in the legislature's amendment of Wis. Stat. § 343.305(4) to replace "shall be orally informed" with "shall read." That amendment changes the verb tense from the passive to the active voice. The more significant revision is the clear and direct language of the implied consent warnings, indicating the legislature's intent that the text should not unreasonably hinder the law enforcement officer's dispatch of the warnings.

accused driver, such as one with impaired hearing, are taken into account and accommodated as much as is reasonable under the circumstances.[17]

¶ 29. We now turn to whether, under the circumstances that were presented to the State Patrol trooper here on February 14, 1998, the trooper used those methods which would reasonably convey the implied consent warnings to Piddington. The trooper first communicated with Piddington using the passenger as an interpreter. When Piddington indicated that he could read and write notes as well as speech-read, the trooper communicated directly with Piddington by speaking to him, and through notes passed back and forth.[18] A review of the notes between Piddington and the trooper reveals that Piddington was aware of what was happening, and his questions to the trooper in particular, reflected his understanding. For example, Piddington

---

[17] As we have indicated before, we do not require that a *Miranda*-like card be developed. *Bryant*, 188 Wis. 2d at 692. However, as we indicated in *Bryant*, we encourage law enforcement and/or the Department of Transportation officials to adopt methods that would assist officers in reasonably conveying the implied consent warnings in a variety of circumstances they are likely to face. The legislature assisted by simplifying the text, but, as the instant case illustrates, the methods used to convey the warnings must also be reasonable. Such reasonable methods could include videos that show the warnings in sign language. Similarly, translations, either by card for those fluent in the language to use or, again, videos, could be prepared in languages other than English that law enforcement officers encounter, such as Spanish and Hmong.

[18] Foregoing use of the passenger as an interpreter was reasonable. Where alternative methods of conveying the necessary information were available, the trooper should not have had to rely upon Piddington's companion, who might not have been an objective interpreter under the circumstances.

wrote a note that "I was just speeding." At another point, he wrote "But did I pass the test as I walked?"

¶ 30. During the stop, it was evident that Piddington sufficiently understood what was communicated to him. Piddington attempted to perform the sobriety tests and, as shown by the patrol car video-tape of the stop, he failed them due to his intoxication, not because he did not understand how to perform the test. Also, Piddington requested a blood test as the State Patrol trooper was preparing to take him to the state patrol headquarters for a breath test, exhibiting further his comprehension of what was happening to him.

¶ 31. Despite his ability to communicate with Piddington, the trooper made reasonable efforts to obtain a sign-language interpreter. He contacted his dispatch, who informed him that no one was available. But an officer who was conversational in sign language was located at the point in time when it was most helpful; namely, to convey the implied consent warnings. The Madison police officer met the trooper and Piddington at the hospital, and was informed by Piddington that he could speech-read and read, and had graduated from high school. The trooper had attempted to read the warnings using an Informing the Accused form until Piddington told him that he could not follow his lips by speech-reading. The Madison police officer then read the warnings to Piddington without objection. Piddington himself read them, and without asking for clarification or explanation, initialed each paragraph, as instructed, in order to show his understanding.

¶ 32. Even though the Madison police officer was not an ASL-certified sign language interpreter, through a combined effort of using her somewhat lim-

ited abilities at sign language, speech-reading and the reading of the Informing the Accused form, the implied consent warnings were reasonably conveyed to Piddington through reasonable methods. There was no need, as Piddington contends, for an ASL-certified interpreter in this instance. As the circuit court determined, the trooper performed a commendable job with his various attempts at accommodating and communicating with Piddington.[19]

¶ 33. The implied consent law requires only substantial compliance. "[S]ubstantial compliance will suffice if it is 'actual compliance in respect to the substance essential to every reasonable objective of the statute.'" *State v. Muente*, 159 Wis. 2d 279, 281 (quoting *Midwest Mut. Ins. Co. v. Nicolazzi*, 138 Wis. 2d 192, 200, 405 N.W.2d 732 (Ct. App. 1987)). The reasonable objective of Wis. Stat. § 343.305(4) is to inform the accused of the implied consent warnings. It follows that the essential aspect of that objective is to use those methods reasonably calculated to convey the information given the circumstances. Given that the State Patrol trooper's conduct shows that reasonable methods to convey the implied consent warnings to Piddington were used, there was substantial compliance with § 343.305(4) here.

---

[19] The circuit court found that Piddington could not "really understand" the implied consent warnings, indicating that the court was analyzing whether the trooper had complied with Wis. Stat. § 343.305(4) by viewing the incident from Piddington's perspective. Whether Piddington subjectively understood the warnings is irrelevant. Rather, whether there was compliance with § 343.305 remains focused upon the objective conduct of the law enforcement officer or officers involved.

¶ 34. However, assuming, *arguendo*, that the trooper did not use reasonable methods to reasonably convey the implied consent warnings and thus violated Wis. Stat. § 343.305(4), Piddington would not necessarily be entitled to suppression of the test results.

> [E]ven though failure to advise the defendant as provided by the implied consent law affects the State's position in a civil refusal proceeding and results in the loss of certain evidentiary benefits, e.g., automatic admissibility of results and use of the fact of refusal, nothing in the statute or its history permits the conclusion that failure to comply with sec. 343.305(3)(a), Stats. [now § 343.305(4)], prevents the admissibility of legally obtained chemical test evidence in the separate and distinct criminal prosecution for offenses involving intoxicated use of a vehicle.

*Zielke*, 137 Wis. 2d at 51.[20] Apart from suppression, Piddington could have pursued an order prohibiting the automatic admissibility of the blood test result pursuant to § 885.235. Instead of relying upon the automatic admissibility of the blood test, the State

---

[20] Zielke, driving while intoxicated, caused an accident resulting in the death of two persons. The circuit court found that there were exigent circumstances that justified taking Zielke's blood for alcohol testing, and that he consented as well. Because the police officer did not give Zielke the required implied consent warnings, the circuit court suppressed the test results, and the court of appeals affirmed. This court reversed the decision of the court of appeals, holding, in part, that violation of the implied consent law did not compel suppression of the blood test results. We also concluded that where there are exigent circumstances or the accused driver consents to a blood test, a warrantless blood seizure is constitutionally permissible. *State v. Zielke*, 137 Wis. 2d 39, 54, 403 N.W.2d 427 (1987).

would have to establish the admissibility of the blood test, including establishing a foundation.

¶ 35. There are also other remedies that an accused driver may pursue where there is evidence that the methods used were not reasonable and would not have reasonably conveyed the implied consent warnings. For example, under Wis. Stat. § 343.305(8), a driver could challenge the automatic administrative suspension of his or her license. One of the issues that the hearing examiner may consider is "[w]hether the person was informed of the options regarding tests under this section as required under sub. (4)." Wis. Stat. § 343.305(8)(b)2.b. Similarly, an accused driver could challenge automatic revocation of his or her license for refusing to submit to a chemical test under Wis. Stat. § 343.305(9). As an initial matter, the notice of the intent to revoke must include "information. . .[t]hat the officer complied with sub. (4)." Wis. Stat. § 343.305(9)(a)2. Then, one of the issues for a hearing on the revocation is "[w]hether the officer complied with sub. (4)." Wis. Stat. § 343.305(9)(a)5.b. Both the administrative suspension and refusal procedure allow accused drivers to maintain their driving privileges while the review is pending. Wis. Stat. § 343.305(8)(a),(10)(a).

¶ 36. We conclude that Wis. Stat. § 343.305(4) requires that a law enforcement officer use those reasonable methods which would reasonably convey, in consideration of the circumstances at the time of the arrest, the implied consent warnings therein. Here, the state trooper employed reasonable methods, in consideration of Piddington's hearing impairment, to reasonably convey the implied consent warnings to Piddington. The trooper complied with § 343.305(4), and, accordingly, there was no violation of § 343.305(4)

that would warrant suppression of Piddington's blood test results.

B

¶ 37. Piddington makes a number of other challenges to the court of appeals' decision based upon alleged violations of constitutional and policy considerations. For example, Piddington contends that the court of appeals' approach—law enforcement need only read the implied consent warnings—violates the constitutional guarantee of due process.[21]

¶ 38. In *Bryant*, this court concluded that the provisions of the implied consent statute did not violate due process. *Bryant*, 188 Wis. 2d 692. There, the defendants claimed that they were "either misinformed or the statutes were hopelessly confused and contradictory." *Id.* We held to the contrary, that "[t]he process guaranteed by the statutes is an appropriate one and the statutory protections and admonitions were afforded each of the defendants in the cases on review." *Id.*

¶ 39. This court has also found that the implied consent warnings, given by way of various Informing the Accused forms, do not violate due process. *See, e.g., Bryant*, 188 Wis. 2d 692; *Crandall*, 133 Wis. 2d 259. The forms used to convey the implied consent warnings do not violate due process because they "adequately alert[ ] accused drivers to the testing process and the consequences of refusal." *Reitter*, 227 Wis. 2d at 240 (citing *Bryant*, 188 Wis. 2d at 692); *see also Crandall*, 133 Wis. 2d at 259 (the Informing the Accused form

---

[21] According to Article I, Section 8(1) of the Wisconsin Constitution, "[n]o person may be held to answer for a criminal offense without due process of law. . . ."

"adequately informed [the defendant] of her rights and responsibilities under the Wisconsin implied consent law").

¶ 40. In *Crandall*, *Bryant*, and *Reitter*, there were no objections to the reasonableness or the adequacy of merely reading the implied consent warnings to the defendants, who apparently were not deaf and understood English. The issue here is not whether the text of the implied consent warnings violates due process, but whether the methods used to convey the warnings violated due process. However, we have already determined herein that Wis. Stat. § 343.305(4) is complied with where reasonable methods are used to reasonably convey the implied consent warnings. Accordingly, here, as in *Bryant*, so long as the process guaranteed by the statute has been afforded the accused driver, whether that process relates to the text of the warnings or the manner in which they are conveyed, there is no due process violation.

¶ 41. Piddington received all the process due under Wis. Stat. § 343.305(4). With the assistance of the Madison police officer, the State Patrol trooper, as § 343.305(4) requires, used those reasonable methods which, under the circumstances at the time of the arrest, would reasonably convey the implied consent warnings. Accordingly, there was no violation of due process.

¶ 42. Piddington also contends that the court of appeals' approach violates the constitutional guarantee of equal protection under the law because hearing persons will have the opportunity to understand the implied consent warnings read to them, and deaf per-

sons will not.[22] "To withstand equal protection review, classifications which distinguish between deaf persons and others need only be rationally related to a legitimate government interest." *Rewolinski v. Morgan*, 896 F. Supp. 879, 881 (E.D. Wis. 1995). The implied consent law is based upon the legitimate government interest of protecting the public welfare, to wit, removing drunk drivers from the road. *Milwaukee County v. Proegler*, 95 Wis. 2d 614, 631, 291 N.W.2d 608 (Ct. App. 1980).

¶ 43. There is no apparent rational justification for permitting English-speaking and hearing drivers access to the implied consent warnings, and purposefully excluding non-English speaking and deaf drivers access to those warnings. Indeed, we have found that deaf persons are entitled to equal access to the legal system. *See* Wis. Stat. § 885.37 (the deaf and hard-of-

---

[22] Equal protection is guaranteed by Article I, Section 1 of the Wisconsin Constitution, and the Fourteenth Amendment to the United States Constitution. Article I, Section 1 of the Wisconsin Constitution states:

> All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed.

The Equal Protection Clause of the Fourteenth Amendment requires that no State shall "deny to any person within its jurisdiction the equal protection of the laws." We treat the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and the Wisconsin Constitution as equivalent because "there is no substantial difference between" them. *Jackson v. Benson*, 218 Wis. 2d 835, 900–01 n.28, 578 N.W.2d 602 (1998) (quoting *State ex rel. Sonneborn v. Sylvester*, 26 Wis. 2d 43, 49–50, 132 N.W.2d 249 (1965)). As such, we refer to cases analyzing the Fourteenth Amendment or Article I, Section 1 of the Wisconsin Constitution.

hearing have a right to interpreters in court); *see also State v. Neave*, 117 Wis. 2d 359, 344 N.W.2d 181 (1984).[23] However, in light of the purpose of the implied consent law—"to facilitate the taking of tests for intoxication and not to inhibit the ability of the state to remove drunken drivers from the highway"—the arresting officer need not take steps to convey the implied consent warnings which would jeopardize his or her ability to obtain evidence of intoxication or get the drunk driver off the road. *Neitzel*, 95 Wis. 2d at 203–04.[24] The arresting officer need

---

[23] In *Neave*, this court held that a criminal defendant has a right to an interpreter.

> We do not hold that there is federal constitutional right to an interpreter. We do hold that as a matter of judicial administration, and to avoid questions of effective assistance of counsel and questions of whether inability to reasonably understand testimony resulted in a loss of an effective right to cross-examination, or whether the right had been waived by a defendant or his attorney with the defendant's assent and how such assent was demonstrated, we adopt the rule herein announced. We also conclude that it removes the feeling of having been dealt with unfairly which is bound to arise when part or all of a trial is incomprehensible because of a language barrier. . . .Fairness requires that such persons who may be defendants in our criminal courts have the assistance of interpreters where needed.

*State v. Neave*, 117 Wis. 2d 359, 365–66, 344 N.W.2d 181 (1984).

[24] This court has also noted that time is of the essence in obtaining evidence of blood alcohol concentration for both the State and defendants. *See State v. Bohling*, 173 Wis. 2d 529, 546–47, 494 N.W.2d 399 (1993); *see also* Wis. Stat. § 885.235(1) (admissibility of blood alcohol test based upon sample taken within 3 hours after the event that allegedly was done under the influence of an intoxicant). Because the passage of time impacts the testing for blood alcohol concentration, that an arresting officer employ those reasonable methods that reasonably convey the implied consent warnings, takes into account the time

only ensure that the implied consent warnings are reasonably conveyed under the circumstances facing the officer at the time of the arrest under Wis. Stat. § 343.305(4). Consequently, § 343.305(4) would not treat an accused driver who is deaf differently than one who hears. Because reasonable methods were used which would reasonably convey the implied consent warnings to Piddington, there has been no disparate treatment here. Piddington was not denied equal protection under the law.

¶ 44. Piddington also contends that the federal Rehabilitation Act of 1973, the counterpart to the federal Americans with Disabilities Act (ADA) is applicable here and required the State to provide an interpreter. The rights and responsibilities established by the ADA and the Rehabilitation Act are nearly identical; the two statutes are, for the most part, distinguished by the fact that the Rehabilitation Act applies only to entities receiving public funding. *Washington v. Central Catholic High Sch.*, 181 F.3d 840, 845 n.6 (7th Cir. 1999). "[T]he standards applicable to one act are applicable to the other." *Id.*

¶ 45. Case law is in conflict as to whether an arrest is a "benefit[ ] of the services, programs, or activities of a public entity," and thus covered by the ADA or Rehabilitation Act of 1973. *See* 42 U.S.C. § 12132; 29 U.S.C. § 794; *see also Rosen v. Montgomery County, Maryland*, 121 F.3d 154, 157 (4th Cir. 1997) (arrest is not within the ambit of the ADA); *Calloway v. Boro of Glassboro Dep't of Police*, 89 F. Supp. 2d 543, 555–56

concern. Accordingly, the approach this court develops today serves to advance a rational purpose of § 343.305, which is to facilitate the gathering of evidence of drunk driving.

(D. N.J. 2000) (station-house investigative questioning is covered by the ADA and Rehabilitation Act). Assuming, *arguendo*, that the Rehabilitation Act covers Piddington's stop and arrest, and thus the standards of both acts are applicable, there is nothing in the record that establishes that the State Patrol receives federal funding, which is a prerequisite to application of the Act. 29 U.S.C. § 794. And, even if there were a violation of the Rehabilitation Act here, Piddington's remedy would not be suppression of evidence, but rather an action under the Act or 42 U.S.C. § 1983.

¶ 46. Nonetheless, the State Patrol trooper followed the accommodation guidelines established in the regulations promulgated under the ADA. *See* 28 C.F.R. § 35.160 (2000). ADA regulations state that public entities "shall take appropriate steps to ensure that communications with . . . members of the public with disabilities are as effective as communications with others," and "furnish appropriate auxiliary aids and services where necessary." 28 C.F.R. § 35.160(a), (b) (2000). "[P]rimary consideration" is to be given to the disabled individual's request. 28 C.F.R. § 35.160(b)(2) (2000). However, the pertinent circumstances should be taken into account.

> Although in some circumstances a notepad and written materials may be sufficient to permit effective communication, in other circumstances they may not be sufficient. For example, a qualified interpreter may be necessary when the information being communicated is complex, or is exchanged for a lengthy period of time. Generally, factors to be considered in determining whether an interpreter is required include the context in which the communication is taking place, the number of people involved, and the importance of the communication.

56 Fed. Reg. 35694 (July 26, 1991). Similarly, as provided by the parties, State Patrol Policy and Procedures indicate that interpreters should be used if possible and whenever practical, that is, at the "point the trooper or inspector determines that the service of a qualified interpreter is necessary to ensure effective communication." Wisconsin State Patrol Policy and Procedure Number 5–10. Using note-writing or other auxiliary aids to communicate is also permitted. *Id.*

¶ 47. The State Patrol trooper and the Madison police officer used various, acceptable, methods to communicate with Piddington. The trooper used auxiliary aids, such as note-taking and demonstrations, which assisted in his communication with Piddington. According to the notes and the videotape of the stop, there is no indication that Piddington questioned or objected to the trooper's methods of conveying the necessary information. Piddington continued to communicate with the trooper even after he requested an interpreter. Review of the notes and the videotape reveals that Piddington obviously failed the sobriety tests not due to a communication error, but because he was impaired. Indeed, an initial test showed that his blood alcohol level was almost three times the legal limit.

¶ 48. The trooper also repeatedly ensured that Piddington was following his instructions, and testified that he took more time and was more lenient with Piddington because of the impaired hearing barrier. At the most crucial moment, when Piddington was provided with the Informing the Accused form, there was an officer on hand who knew sign-language. She was not a certified interpreter, but she was conversational in sign-language. She reviewed and completed the form

with Piddington, without objections or questions from Piddington.

¶ 49. The trooper complied with both the State Patrol Policies and Procedures and federal regulations promulgated under the federal Rehabilitation Act of 1973 by using note-taking and other auxiliary aids, including an officer with working knowledge of sign-language, to ensure that the necessary information was conveyed to Piddington. Consequently, contrary to Piddington's contention, there was no need for a certified sign-language interpreter here.

### III

¶ 50. Finally, Piddington contends that suppression of his blood test result is justified here, if not based upon an alleged violation of Wis. Stat. § 343.305(4) concerning the implied consent warnings, then, based upon the contention that Piddington requested, but did not receive, an alternative test for blood alcohol concentration. Piddington relies upon *State v. Renard*, 123 Wis. 2d 458, 367 N.W.2d 237 (Ct. App. 1985) and *State v. McCrossen*, 129 Wis. 2d 277, 385 N.W.2d 161 (1986). In both cases, the circuit court found that the accused driver had repeatedly requested an additional chemical test that was not given. *Renard*, 123 Wis. 2d at 460; *McCrossen*, 129 Wis. 2d at 282–83. Also, in both cases, the circuit court suppressed the results of the first tests as "an appropriate sanction" for the failure to perform the second requested test. *Renard*, 123 Wis. 2d at 461; *McCrossen*, 129 Wis. 2d at 287.[25]

---

[25] Piddington also relies upon *State v. Walstad*, 119 Wis. 2d 483, 351 N.W.2d 469 (1984). In *Walstad*, this court concluded that the test ampoule from the breathalyzer machine need not be provided to the defendant for re-testing. *Id.* at 527–28. The

¶ 51. Piddington claims that he requested an alternative test. However, unlike *Renard* and *Mc Crossen*, the circuit court here made no factual finding that Piddington had requested a second, alternative test.[26] Piddington requested a blood test as the State Patrol trooper was about to take him to State Patrol headquarters for a breathalyzer test. However, this was before he had been formally notified of his right to request a second test. After he had been informed of his right to request a second test, Piddington did not request such a test. Unlike in *Renard* and *McCrossen*, here, Piddington did not request a second alternative test after he submitted to the initial test. *Renard*, 123 Wis. 2d at 460; *McCrossen*, 129 Wis. 2d at 281. The only test he requested, he received, that is, the blood test.[27]

defendant had not requested a second test, but only requested to test the used ampoule. There is no dispute that an accused driver has a right to request a second test. *Id.* at 527. There is, however, no evidence that the defendant here requested a second test after he was informed of his right to request a second test.

[26] The circuit court only found that Piddington needed an ASL interpreter to understand the information given him concerning his right to request a second test. (R. at 28:2.) We have concluded, however, that the trooper needed to use reasonable methods to reasonably convey the implied consent warnings, including the right to request a second test, and, as the circuit court also found, the "attempts of law enforcement to communicate with the defendant were reasonable under all the circumstances." (R. at 28:1–2).

[27] "The second test affords the defendant the opportunity to scrutinize and verify or impeach the results of the . . . test administered by enforcement authorities." *Walstad*, 119 Wis. 2d at 527. The second test may also provide exculpatory evidence. *State v. McCrossen*, 129 Wis. 2d 277, 294, 385 N.W.2d 161 (1986). However, Piddington has not even contended, let alone

¶ 52. Even if Piddington had requested but did not receive an alternative test, he would not be entitled to automatic suppression of the results of the test he did have, as he now contends. As discussed earlier, the implied consent law does not dictate that a violation thereof requires suppression of a blood test as a remedy. *Zielke*, 137 Wis. 2d at 51. Accordingly, Piddington's reliance upon *McCrossen* is misplaced. As we explained in *Zielke*, 137 Wis. 2d at 55–56:

> We acknowledge that in [*McCrossen*] this court approved suppression of a blood alcohol test in a driving while intoxicated prosecution. In that case, unlike the instant case, the defendant, who was arrested for operating under the influence contrary to sec. 346.63(1)(a), Stats., specifically asked the arresting officer who administered the breathalyzer test if she could have another test, either blood or urine, because she did not believe the results of the first test. The police told the defendant she would have to pay for any alternative test, which is contrary to sec. 343.305(5). The defendant agreed but the police never administered the requested alternative test. In addition, she was never informed by police that she could be released in order to get an alternative test. In fact, though a friend arrived ready to post bail, she was not released until hours later. *On those facts, suppression was an appropriate remedy, but it is by no means required by the implied consent law.*

(Emphasis added.)[28]

shown, how a second test would have provided impeachment or exculpatory evidence. *See id.* at 294.

[28] Also, the precise issue before this court in *McCrossen* was "not whether suppression is appropriate, but whether the denial of a second test deprived the defendant of constitution-

¶ 53. There would be no reason for an automatic suppression here, even if Piddington had requested a second test. The conduct of the law enforcement officers with respect to the defendants' requests for an alternative test in *Renard* and *McCrossen*, which supported the circuit court's suppression there, is not evident here. In *Renard*, the defendant was taken to a hospital for injuries following an accident. 123 Wis. 2d at 460. There, an officer arrested Renard for driving while intoxicated. The officer had Renard submit to a blood test, but did not give him the breathalyzer test that he requested. The officer could have inquired at the hospital to determine whether Renard would have been released in time to give him a breathalyzer test. But the officer left, and yet Renard was released in time to take a breathalyzer test. *Id.* In *McCrossen*, the defendant asked for an alternative test, and was told she had to pay for it, which was not true. 129 Wis. 2d at 281. McCrossen nonetheless agreed to pay for another test, but she never got it, nor was she informed that she could be released to get the other test. *Id.* "The defendant also was never informed that there was an alternative test that the police department was prepared to administer at police expense." *Id.* Here, in contrast, Piddington was not misled; he was accurately informed about the alternative test procedure; and, he got the test he requested.

¶ 54. Piddington did not request an alternative test after he was informed of that right. Accordingly, assuming *arguendo*, that somehow his right to request a second test was violated, that is not a reason to sup-

ally material evidence, and thereby required dismissal of the charge." *Id.* at 287–88. Piddington does not make such a contention here.

press the test results of the blood test he did request.[29] There are no other circumstances here that would warrant suppression of the test results even if Piddington had requested an alternative test, after being informed of that right.

## IV

¶ 55. The legislature's intent regarding the implied consent warnings is that accused drivers are to be advised of the warnings, which requires law enforcement officers to utilize those methods which, according to the circumstances that existed at the time of the arrest, were reasonable and would reasonably convey the warnings. Whether the accused driver has actually comprehended the warnings is not part of the inquiry, rather the focus rests upon the conduct of the officer. We conclude here that the law enforcement officers involved used reasonable methods to reasonably convey the implied consent warnings under the circumstances existing at the time of the arrest. In addition, there was no evidence that Piddington was denied a second test that he requested after the blood test he requested. Accordingly, there was no violation of § 343.305(4) which would warrant suppression of Piddington's blood alcohol concentration test results. We thus affirm the court of appeals.

---

[29] Moreover, "if evidence is otherwise constitutionally obtained, there is nothing in the implied consent law which renders it inadmissible in a subsequent criminal prosecution," even if there was a "failure to advise the defendant as provided by the implied consent law." *Zielke*, 137 Wis. 2d at 51–52. One constitutional way for evidence to be obtained is by consent. *Id.* at 52. Here, Piddington did not merely consent to a blood test, he requested it even before he was given the Informing the Accused form.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 56. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE *(concurring)*. In this case, one person who is profoundly deaf has come into contact with the legal system. Many people in this state cannot hear, speak, or understand the English language. For some this is because of a hearing impairment, for others because they are fluent in languages other than English. Because language is the basic tool of the legal system these people cannot fully participate.

¶ 57. According to the 2000 census figures, Wisconsin's Hispanic and Asian populations roughly doubled in the past decade.[1] Getting qualified interpreters for our increasingly diverse and multicultural population is an urgent issue for law enforcement, the courts, social services, and others in the legal system.[2] Courts should provide interpreters as a basic service to ensure fairness of court proceedings.[3] As part of its efforts to address court-related interpretation and

---

[1] Larry Sandler and Greg Borowski, *Madison, Dane County lead growth; Fox Valley grows twice as fast as state's southeastern region,* Milwaukee Journal Sentinel, March 9, 2001, at 1A.

[2] See Heather Pantoga, *Injustice in Any Language: The Need for Improved Standards Governing Courtroom Interpretation in Wisconsin,* 82 Marq. L. Rev. 601 (1999).

[3] "Fairness requires that [those who speak and understand only languages other than English] who may be defendants in our criminal courts have the assistance of interpreters where needed." *State v. Neave,* 117 Wis. 2d 359, 366, 344 N.W.2d 181 (1984).

translation issues, the Wisconsin court system recently published a report entitled "And Justice for All."[4]

¶ 58. This case illustrates how vital it is for the legislative, executive, and judicial branches of this state to work together to provide qualified interpreters and translators so that persons who cannot hear, speak, or understand English have meaningful access to the legal system. That's the fair and right thing to do.

¶ 59. DIANE S. SYKES, J. *(concurring)*. I agree with the majority's rejection of the State's argument, adopted by the court of appeals, that the implied consent law requires nothing more than an oral, English language reading of the implied consent warnings, regardless of whether the drunk driving suspect can either hear or understand spoken English. The majority adopts a new test for evaluating an arresting officer's compliance with the implied consent statute, one that focuses on the reasonableness of the officer's conduct in administering the implied consent warnings. I write separately to express some concern about the practical operation of the new test.

¶ 60. As I see it, the question in this case is whether Wis. Stat. § 343.305(4)(1995–96), which requires an arresting officer to "orally inform"[1] a drunk driving suspect of his rights and responsibilities under

---

[4] Committee to Improve Interpreting & Translation in the Wisconsin Courts, *And Justice for All: Improving Interpretation in Wisconsin's Courts* (Oct. 2000), available at http://www.courts.state.wi.us/circuit/pdf/Interpreter_Report.pdf

[1] The current statute says the officer "shall read" the implied consent warnings to the suspect. Wis. Stat. § 343.305(4) (1998–99). The majority opinion concludes that this change in

the implied consent law before obtaining a chemical test for intoxication, requires the officer to do so in a language the suspect understands. The circuit court said "yes." The court of appeals said "no." This court says "maybe yes, maybe no." It depends.

¶ 61. The defendant in this case has been profoundly deaf since birth and communicates in American Sign Language (ASL). He asked for a sign language interpreter at the time of his arrest for drunk driving, but none was available. The arresting officer obtained the assistance of an officer who knew some sign language, but was not fluent in ASL. The officers communicated with the defendant partially in writing and partially through sign language, and the defendant was given the written Informing the Accused form to read. The form was also read to him orally. The defendant wrote a note asking for a blood test, which registered a blood alcohol concentration of 0.206.

¶ 62. The defendant moved to suppress the test results, arguing that he should have been provided with an ASL interpretation of the implied consent warnings. The circuit court agreed, and granted the motion. The court of appeals reversed. The majority affirms the court of appeals, but on different grounds. According to the majority opinion, whether an officer has complied with the statute depends upon whether he used "reasonable methods" to "reasonably convey" the implied consent warnings to the suspect—not, apparently, whether the officer used a language the suspect could understand.

¶ 63. It is not entirely clear what this new "reasonable methods" to "reasonably convey" test requires an officer to do when confronted with a drunk driving

language makes no substantive difference in the interpretation of the statute, majority op. at nn.15–16, and I agree.

suspect who does not communicate in spoken English, either because he is deaf, or because he speaks and understands a foreign language only. The majority does not read the statute to require an interpreter or a recorded translation of the warnings in this situation, as long as the officer's communication "methods" were otherwise reasonable and would "reasonably convey" the warnings.

¶ 64. I assume that an officer who merely reads the implied consent warnings out loud to a deaf person, without more, will not have complied with the statute under the "reasonable methods" to "reasonably convey" test. It seems to me that this would be considered an unreasonable method of communicating with a deaf person, or would not be considered reasonably likely to convey the warnings to one who cannot hear. Similarly, I assume that an officer who merely reads the implied consent warnings in English to a suspect who speaks only Spanish will not have complied with the statute, because this, too, would be considered unreasonable under the test.

¶ 65. These conclusions would be consistent with common sense and the rule of statutory construction that requires courts to avoid interpretations of statutes that lead to absurd or unreasonable results. *Verdoljak v. Mosinee Paper Corp.*, 200 Wis. 2d 624, 636, 547 N.W.2d 602 (1996); *State v. Williams*, 198 Wis. 2d 516, 532, 544 N.W.2d 406 (1996); *State v. Zielke*, 137 Wis. 2d 39, 51, 403 N.W.2d 427 (1987). Indeed, this would be the only construction of the statute that "does not produce 'questionable results' and make the law look 'silly.' " *Williams*, 198 Wis. 2d at 532. The notion that the statute requires only an oral English language reading of the implied consent warnings to a deaf or non-English speaking suspect is manifestly unreason-

able. The legislature cannot have intended a meaningless or futile exercise such as the State's suggested construction of this statute would produce in this situation. *See*, 2A Sutherland, *Statutes and Statutory Construction*, § 45:12, at 94 (6th ed.) ("it cannot be presumed that the legislature would do a futile thing").

¶ 66. Furthermore, "the cardinal rule in interpreting statutes is that the purpose of the whole act is to be sought and is favored over a construction which will defeat the manifest object of the act." *Student Ass'n of Univ. of Wisconsin-Milwaukee v. Baum*, 74 Wis. 2d 283, 294–95, 246 N.W.2d 622 (1976); *see also, Caldwell v. Percy*, 105 Wis. 2d 354, 361–62, 314 N.W.2d 135 (Ct. App. 1981). This statute has a dual purpose: to facilitate the collection of evidence of intoxicated driving, and to ensure that persons arrested for drunk driving are informed about their rights and obligations under the implied consent law. *See* majority op. at ¶¶ 17–18. The second of these purposes would be thoroughly defeated if the statute is read to entitle a deaf or non-English speaking suspect to nothing more than an oral, English language recitation of the warnings, which he has not the slightest hope of comprehending.

¶ 67. The majority correctly notes that the implied consent law is not the only means by which a law enforcement officer may lawfully obtain chemical evidence of intoxication from a drunk driving suspect. Majority op. at ¶ 34. The Fourth Amendment permits the warrantless seizure of chemical evidence of intoxication based upon probable cause and exigent circumstances. *Zielke*, 137 Wis. 2d at 51–52 (citing *Schmerber v. California*, 384 U.S. 757, 766–72 (1966)). Suppression is not required as a remedy for noncompliance with the implied consent law, although the State may lose the evidentiary benefits of automatic admissi-

bility and the presumption of intoxication specified in Wis. Stat. §§ 343.305(5)(d) and 885.235. *Id.*

¶ 68. Accordingly, I concur in and join the majority's decision to affirm,[2] with the foregoing observations about the practical application of the court's new test for compliance with the implied consent statute in the case of deaf and non-English speaking suspects.

---

[2] In particular, I agree with the majority's reiteration that there is no "subjective confusion" defense to the admissibility of a chemical test obtained under the implied consent law, as well as its treatment of the defendant's due process, equal protection, Americans with Disabilities Act and Rehabilitation Act arguments.